In re FOUR SEASONS SECURITIES
LAWS LITIGATION.

ARTHUR ANDERSEN & CO. et al.,
Appellants,

v.

STATE OF OHIO, Appellee.

Nos. 73–1781–73–1784.

United States Court of Appeals,
Tenth Circuit.

Argued May 16, 1974.

Decided Aug. 13, 1974.
Certiorari Denied Nov. 25, 1974.
See 95 S.Ct. 516.

William G. Paul and Harry A. Woods, Jr., of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl. (Wilson & McIlvaine by Charles W. Boand and George W. Thompson, Chicago, Ill. of counsel on the brief for appellant Arthur Andersen & Co.); (Michael H. Rauch and Alan J. Russo, of Fried, Frank, Harris, Shriver & Jacobson, New York City, on the brief for appellant Gordon H. McCollum); (Breed, Abbott & Morgan, Thomas W. Kelly and Richard W. Lyon, New York City, of counsel on the brief for appellants Walston & Co., Inc., Montgomery Co., and Glenn R. Miller) for appellants Arthur Andersen & Co., Gordon H. McCollum, Walston & Co., Inc., Montgomery Co., and Glenn R. Miller.

Robert B. McCaw, Washington, D. C. (Arthur F. Mathews, of Wilmer, Cutler & Pickering, Washington, D. C., with him on the brief), for appellant Jack L. Clark.

Richard F. Stevens, Sp. Counsel to Atty. Gen., Cleveland, Ohio (William J. Brown, Atty. Gen. of Ohio, Ronald B. Brown, Asst. Atty. Gen., of counsel, Wayne C. Dabb, Jr., of Baker, Hostetler & Patterson, Cleveland, Ohio, on the brief), for appellee.

Before LEWIS, Chief Judge, and McWILLIAMS and BARRETT, Circuit Judges.

LEWIS, Chief Judge.

This appeal probes the interrelationship between Rule 23 class actions and Rule 60 relief from judgments. It follows the granting of such relief to the state of Ohio after the judgment on a class-action settlement and arises as yet another offshoot of the complex litigational network that has been constructed around securities issued or guaranteed by Four Seasons Nursing Centers of America, Inc. or Four Seasons Equity Corporation.[1] The transactions relevant here involve $4,000,000 in loans made by Ohio to Four Seasons Nursing Centers of America. The facts surrounding the execution of these loans are set out in Ohio v. Four Seasons Nursing Centers of America, 10 Cir., 465 F.2d 25, at 26, 27 as follows:

In early 1970, Mr. Jack L. Clark, the president of Four Seasons, received information that a Mr. Ronald R. Howard of Los Angeles, California, was in a position to assist Four Seasons in borrowing needed funds for continued operation and expansion. Howard and Clark conferred in Oklahoma City for the purpose of consummating an agreement for the procurement of funds. It was anticipated that Four Seasons would borrow between $20,000,000 and $24,000,000 from the State of Ohio. Howard contacted Crofters, Inc., a Columbus, Ohio, investment firm. Mr. Harry A. Groban, the executive vice president of Crofters, requested a credit rating on Four Seasons from the National Credit Office, a division of Dun and Bradstreet. An employee of the Na-

---

1. For a thorough account of the history of the Four Seasons companies *see* In re Four Seasons Securities Law Litigation (Opinion No. 2), (W.D.Okl.) 58 F.R.D. 19.

tional Credit Office procured the latest annual report of Four Seasons, as well as other statements and bank information concerning that corporation from Mr. John Mee, a vice president of and attorney for Four Seasons. Based on this material, the National Credit Office gave Four Seasons a rating of "prime" for commercial paper. This information was communicated by letter to Groban; Groban in turn furnished the information to Mr. Robert F. Gardner, Deputy Treasurer of the State of Ohio.

Groban advised Mee that funds would be available to Four Seasons from the State of Ohio. Thereafter, Mr. Alex Russell, an officer of Four Seasons, went to Columbus, Ohio, to secure the funds. On March 9, 1970, Russell consummated a loan of $3,000,000 for Four Seasons with the State of Ohio through Gardner and in the presence of Groban. The loan was evidenced by two promissory notes of Four Seasons, one for $2,000,000 payable in 120 days and another for $1,000,000 due in two years. The $2,000,000 note was made on the basis of 120 days with the understanding that when due the note would be renewed for a period of two years. A second loan for $1,000,000 was advanced on March 23, 1970; a note for $1,000,000 payable in two years to the State of Ohio was executed on that date.

Ohio subsequently sought reclamation of these funds against the Trustee in the Chapter X reorganization proceedings of the Four Seasons companies. It charged, *inter alia*, that Four Seasons had intentionally made material and fraudulent misrepresentations concerning its financial condition to the National Credit Office in order to obtain a prime rating, and that Ohio's loans had been made in reliance on this rating. The trial court found neither fraud nor misrepresentation, In re Four Seasons Nursing Centers of America, W.D.Okl., 329 F.Supp. 647, and was upheld on appeal. The appellate court also found Ohio's constructive trust argument unpersuasive and held that the evidence concerning procurement of the funds did not establish noncompliance with the applicable Ohio statute. Ohio v. Four Seasons Nursing Centers of America, 10 Cir., 465 F.2d 25.

Ohio filed three appeals from orders in the Chapter X proceedings. It was particularly opposed to those portions of successive plans of reorganization which resulted in one-third of the stock in the reorganized corporation (Anta) going to "Class G Creditor Stockholders." Ohio was designated a "Class C Creditor" (general unsecured creditor) and was permitted under the amended plan to receive one share of Anta stock for each $7 principal amount of allowed claims.

On May 21, 1971 ten actions—seven of which claimed to have been brought on behalf of all purchasers of stock of the Four Seasons companies who suffered a loss—were brought in or transferred to the Western District of Oklahoma and were assigned to Judge Thomsen by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407. In re Four Seasons Securities Law Litigation, Jud.Pan.Mult.Lit., 328 F.Supp. 221. Numerous other cases were subsequently transferred. All together 40 individuals, partnerships, and corporations were named as defendants in one or more of the actions, which sought to be treated as class actions. In one or more of the complaints, claims were asserted against some or all of the defendants under §§ 5, 11, 12, and 17(a) of the Securities Act of 1933, under §§ 9, 10(b), and 20 of the Securities and Exchange Act of 1934, and under Rule 10b-5 of the SEC. The litigation proceeded as M.D.L. 55.

Meanwhile, in March 1972 the state of Ohio, through the office of the Attorney General, filed three suits:

(1) State of Ohio v. Crofters, Inc., et al., Civil Action No. 72–81, in the United States District Court for the Southern District of Ohio, Western

Division. Among the several groups of defendants in that case were Clark, Gray, Mee, Andrews and McCollum, defendants in some of the M.D.L. 55 cases. The complaint includes eleven claims:

First Claim—§ 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

Second Claim—§ 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.-10b–5; § 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b).

Third Claim—§ 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

Fourth Claim—§ 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

Fifth Claim—§ 17(a) of the Securities Act, 15 U.S.C. § 77q(a); § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5.

Sixth Claim—§ 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1), Rule 15cl–2, 17 C.F.R. § 240.17cl–2; § 15(c)(2) of the Exchange Act, 15 U.S.C. § 78o(c)(2).

Seventh Claim—§ 1707.44(B)(4), § 1707.43, Ohio Revised Code.

Eighth Claim—§ 1707.44(G), § 1707.43, Ohio Revised Code.

Ninth Claim—§ 1707.14, § 1707.-44(A), and § 1707.43, Ohio Revised Code.

Tenth Claim—§ 1707.41, Ohio Revised Code.

Eleventh Claim—Common Law Fraud.

Some of these statutory bases are the same as those in one or more of the M.D.L. 55 class actions; some are not.

Clark filed a counterclaim against Ohio in this case, third-party claims against Walston & Co. and Arthur Andersen & Co., and various cross-claims.

(2) State of Ohio v. Herbert, et al., in the Court of Common Pleas of Franklin County, Ohio.

This is an action against the Treasurer of the State, another official, and the sureties on their bonds, alleging violation of certain Ohio statutes and of the officials' duties. All of the defendants in State of Ohio v. Crofters, Inc., et al., have been brought into that case as third-party defendants.

(3) Shaul, Director of Commerce of the State of Ohio v. Crofters, Inc., et al., in the Court of Common Pleas of Franklin County, Ohio. Clark, Gray, Mee, Andrews, and McCollum are also defendants in that case, which is based on alleged violations of the Ohio Code, and seeks injunctive relief.

Negotiations took place in the spring and summer of 1972 which were aimed at the settlement of various claims, including those in the M.D.L. 55 actions, the actions of the Trustee of the debtor estates against many of the M.D.L. 55 defendants and the appeals of Ohio in the Chapter X proceedings. Various attorneys for the state of Ohio were aware of these negotiations and participated in one or more of the discussions, but no one moved to have State of Ohio v. Crofters, Inc., in the Southern District of Ohio, transferred to M.D.L. 55 in the Western District of Oklahoma.[2]

In July 1972 Judge Thomsen stated he was willing to enter an order in M.D.L. 55 which would, in effect, designate five actions as class actions and divide the plaintiffs preliminarily, and subject to the right to modify, into two classes for pretrial and discovery purposes. Ohio was a member of one of these classes. At this time all counsel present, which did not include counsel for Ohio, asked the court to hold up entry of the proposed order to permit them to continue

---

2. A motion to transfer that case was subsequently made to the Judicial Panel on Multidistrict Litigation, and the case was thereafter transferred by the panel to M.D.L. 55. In re Four Seasons Securities Laws Litigation, 361 F.Supp. 636.

settlement negotiations. The order was held up and negotiations continued until a settlement was reached and presented to the court on September 21, 1972.

It became apparent during these negotiations that settlement of Ohio's claims in the Chapter X proceedings was a prerequisite to the settlement of the Trustee claims in M.D.L. 55 because the plan for reorganization could not be carried out until Ohio's claims were settled. Toward this end attorneys for Ohio and the Trustee continued negotiations until a settlement was agreed upon on September 13, 1972. During the course of these discussions, the Ohio attorneys met with counsel for some of the M.D.L. defendants, although they did not meet with attorneys for the plaintiffs in that litigation. The Ohio attorneys were never told that Ohio was a member of one of the classes which the court had indicated would be preliminarily designated in M.D.L. 55 if settlement negotiations there fell through. Ohio's attorneys did not inquire about the M.D.L. 55 classes and no one volunteered the information to them.

Gretick, the attorney in charge of the case for Ohio, went to Oklahoma City on September 19 to work with Bailey, the Trustee's attorney, on the terms of the joint application for settlement in the Chapter X proceedings. Bailey left for Baltimore on September 20 and was present when the M.D.L. 55 settlement was reached and the order signed by the court on September 21. That order defined the Rule 23(b)(3) classes as follows:

(a) All persons (other than the Four Seasons companies, the Trustee thereof, the reorganized company, its subsidiaries and affiliates, defendants named in any of these class actions, and the partners of any of said defendant partnerships) who at any time from May 9, 1968 to July 22, 1970, both inclusive, purchased or acquired securities or commercial paper issued by America, Franchise, or Overseas, and who suffered a loss thereon or after July 22, 1970 still owned any such securities or commercial paper;

(b) All persons (other than the Four Seasons companies, the Trustee thereof, the reorganized company, its subsidiaries and affiliates, defendants named in any of these class actions, and the partners of any of said defendant partnerships) who at any time from November 6, 1968 to July 22, 1970, both inclusive, purchased or acquired securities or commercial paper issued by Equity or FSN, and who suffered a loss thereon or after July 22, 1970 still owned any such securities or commercial paper.

Bailey returned to Oklahoma City on September 22 and completed work with Gretick on the joint application for settlement in the Chapter X proceedings that evening. He told Gretick that M.D.L. 55 "had been settled around Ohio." By the terms of the settlement Ohio received, in addition to the Anta stock it received as a Class C Creditor, proceeds from the sale of valuable real estate. Ohio, in return, agreed to dismiss its pending appeals.

In addition to the designation of classes which, it is conceded here, included the state of Ohio,[3] the M.D.L. 55 order of September 21 included several other clauses pertinent to our consideration on appeal. Clause 19 preserved the rights of the M.D.L. 55 defendants to assert their claims and causes of action, including cross-claims and claims for contribution and indemnity, which related to or arose out of or in connection with the Ohio $4,000,000 loan and the litigation relating thereto. In addition, the order provided that claims of Class C Creditors in the Chapter X proceeding should be reduced to ten percent of the face amount of the securities on which their claim was based. This provision was in recognition of the fact that Class C

---

3. Ohio was a class member as holder of securities, as defined in the Federal Securities Laws, or commercial paper, or both.

Creditors had already received compensation through the Chapter X proceedings.

Finally, the order made it clear that the settlement was intended to include all claims which had been or could be asserted by or on behalf of the classes, or any member thereof, arising out of or relating to any act or omission concerning the Four Seasons companies, and other related or affiliated companies, or relating to the business, management or financial statements of any of the Four Seasons companies, or transactions in the securities or commercial paper of any of the Four Seasons companies, prior to the date of entry of the final judgment provided for in the order, whether or not asserted in the class actions. It barred forever the prosecution against the defendants of any and all settled claims by any member of the classes, except by those who opted out.

Notice of the proposed settlement was published in the Wall Street Journal and two copies of the order, notice, and accompanying papers were mailed, one to Ohio, c/o the Attorney General, and one to William Brown, Attorney General. The return receipts indicated that the mailings were delivered to the office of the Attorney General, one on October 6 and the other on October 10, 1972. One set was subsequently discovered in Gretick's file. The other has not been located.

On October 12 Gretick was in Oklahoma City for hearings on the settlement of Ohio's claims in the Chapter X proceedings. He had not read the September 21 order or the notice. Bailey showed him a copy of the order, Gretick "riffled" through it and asked Bailey to mail him a copy. This was not done. Gretick left the Attorney General's office two weeks later and Ronald B. Brown was made lead counsel in the Four Seasons case. Late in October he saw the M.D.L. order of September 21, read the first page and thumbed through some additional papers, assuming that Gretick had done what was necessary. No election to opt out was filed by Ohio. Hearings on the M.D.L. 55 settlement were held on November 16 and 17, 1972. The judgment approving the settlement was signed November 30 and entered on December 4, 1972.

On December 5 counsel for Clark referred to the settlement during a pretrial hearing in State of Ohio v. Crofters, Inc., et al., and Brown then read the September 21 order in M.D.L. 55 for the first time. Ohio took no appeal from the judgment but on January 2, 1973 filed its motion for relief from judgment under Rule 60(b)(1), (4), and (6).[4] The motion was granted and this appeal by affected M.D.L. 55 defendants followed.[5]

In granting Ohio's motion for relief, the court below examined each of the allegations presented under Rule 60(b)(1), (4), and (6). Ohio first claimed that its failure to opt out was the result of mistake, inadvertence, surprise, or excusable neglect under Rule 60(b)(1). The court was not persuaded by this claim. "If the order was not read, one or more of Ohio's attorneys were negligent; if it was read, and not acted upon, they were equally negligent." 59 F.R.D. at 678. The court concluded, however, that Ohio negotiated with

4. Rule 60. Relief From Judgment Or Order

. . .

(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; * * * (4) the judgment is void; * * * or (6) any other reason justifying relief from the operation of the judgment.

5. The court below entered an order based upon Ohio's assurance that it would not file an appeal from the December 4 judgment, authorizing Ohio to file a contingent proof of claim under the M.D.L. 55 settlement. The proof of claim was to become null and void if Ohio's Rule 60(b) motion was finally granted, but would become fully effective and unqualified if the motion was denied.

the Chapter X Trustee in the belief that it would not be included in the M.D.L. 55 classes and the attorneys for the Chapter X Trustee did nothing to dispel this belief. These circumstances, plus the statement of the attorney for the Chapter X Trustee "that the case had been settled around Ohio," explained but did not excuse Ohio's neglect. 59 F.R.D. at 679.

Ohio's Rule 60(B)(4) claim was that the judgment as to it was void. In this context the court considered the Rule 23(a)(3) requirement that the claims or defenses of the representative parties must be typical of the claims or defenses of the class, the Rule 23(a)(4) requirement that the representative parties will fairly and adequately protect the interests of the class, and the Rule 23(c)(2) requirement that in any class action maintained under (b)(3) the members of the class must be given the best notice practicable under the circumstances. When these requirements are met, the court reasoned, due process is satisfied.

The court first found that the required notice was given (in fact two copies of the notice were actually received by Ohio) and then proceeded to examine the adequacy of representation and typicality questions. On the typicality issue, Ohio sought to distinguish its position from that of other M.D.L. 55 class members on grounds that (1) Ohio's loans were evidenced by promissory notes maturing in two years and that Ohio, unlike the other securities purchasers, was bargaining for interest return alone and not for any present or prospective equity in Four Seasons; (2) that its loans were privately negotiated through a finder-broker and required no registration statement, prospectus, other reporting, or professional underwriting group; and (3) that the promissory notes were represented to be commercial paper.

The court concluded that Ohio was included within one of the classes created in M.D.L. 55 because the promissory notes it acquired were securities within the meaning of the Federal Securities Act of 1933 and the Securities and Exchange Act of 1934. Reasoning that typicality does not require that claims of class representatives be "co-extensive with" or "identical to" those of other class members, the court pointed out that each member of the class purchased his security or securities in transactions separate from other class members and that the fact patterns for each necessarily varied. All relied on alleged misrepresentations embraced in the general conspiracy theory advanced by class representatives and covered by the alleged violations of the securities laws. After considering all of the evidence, the court found that "the claims of the class members were typical of the claims of Ohio asserted in State of Ohio v. Crofters, Inc., et al., and the third-party complaints against Clark and others in State of Ohio v. Herbert et al., but were not typical of the claims asserted by Ohio in its complaint against Herbert, Gardner and their sureties." 59 F.R.D. at 682.

Ohio's contention that it had not been represented adequately was premised on the same distinctions between its claims and those of the class representatives which were alleged in its typicality argument. The court found that these distinctions alone, again with the exception of the claims against Herbert, Gardner, and their sureties, did not demonstrate a lack of adequate representation. But when viewed in light of the ultimate terms of the settlement, which provided for the claims of Class C Creditors in the Chapter X proceedings to be reduced to ten percent of the face amount of the securities on which their claim was based and further reserved the rights of the M.D.L. 55 defendants against Ohio, the representation question became more troublesome. The court pointed out that none of the Class C Creditors was a class representative and that there was therefore some force to Ohio's contention that a Class C Creditor could not be adequately represented in the settlement. In addition, the court

found that the provisions preserving the claims of the M.D.L. defendants against Ohio "were included with the expectation on the part of everyone that Ohio would opt out." 59 F.R.D. at 683. Finally, when these provisions and the differences between Ohio's claims and the claims of other class members were considered together, "Ohio has made a strong case that the judgment should be held void as to all the claims of Ohio." Id.

Added to these factors, under Rule 60(b)(6), was the "lulling effect" which the court felt the dealings between the attorneys for Ohio and the attorney for the Chapter X Trustee had on Ohio's failure to opt out. The end result was that "the totality of the evidence require[d] that Ohio be relieved from the operation of the judgment." Id.

This account of the lower court's decisional process is presented in some detail in order to demonstrate that the court did not pigeonhole its basis for relief into any particular one of the Rule 60(b) categories. Reliance to some extent was placed on 60(b)(1), (4), and (6) and our appellate review cannot be conveniently telescoped. We must therefore consider whether, under all of the circumstances, the relief granted was justified.

■ We must at the outset dismiss appellants' contention that the provisions of Rule 60(b)(1)–(5) and 60(b)(6) are mutually exclusive and that the court below misapplied the rule in apparently aggregating claims under 60(b)(1), (4), and (6). It is true that the weight of authority indicates that a Rule 60(b)(6) motion must be based upon some reason other than those stated in clauses (1)–(5). Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266; United States v. Karahalias, 2 Cir., 205 F.2d 331 (on rehearing); and 7 Moore's Federal Practice ¶ 60.27(1). But it is also clear that this rule stems of necessity from the one-year time limitation which attaches to motions for relief under 60(b)(1)–(3). Rule 60(b)(6) requires only that the motion be made within a "reasonable time" and it would obviously frustrate the one-year limitation if a 60(b)(6) motion could be brought after this period for reasons articulated in 60(b)(1)–(3). The cases support this interpretation of the exclusivity rule, and motions timely brought under Rule 60(b) have encountered little technical difficulty as to whether the motion in fact comes under clause (6) or one of the earlier clauses. Laguna Royalty Co. v. Marsh, 5 Cir., 350 F.2d 817; Rooks v. American Brass Co., 6 Cir., 263 F.2d 166; 11 Wright and Miller, Federal Practice and Procedure § 2864, at 212. Where, as in the case at bar, the motion is timely filed under any of the 60(b) clauses, the court should not be bound by a strict categorization of particular claims. We thus do not consider it necessary to attempt to pinpoint which, if any in particular, of the 60(b) clauses formed the basis for the decision of the court below.

When viewed in its entirety, it is apparent that the real basis for the court's decision below, notwithstanding the analysis directed to particular clauses under Rule 60, was its belief that under all of the circumstances presented Ohio was simply denied due process of law. The court in essence concluded that the aforementioned clauses in the settlement agreement reflected an inadequacy of representation which, at least with respect to the claims against Herbert, Gardner, and their sureties, was predetermined through the lack of typicality of those claims under Rule 23(a)(3). It is interesting to note in this latter respect that at least one court has stated that the typicality requirement was "designed to buttress the fair representation requirement in Rule 23(a)(4)." Rosado v. Wyman, E.D.N.Y., 322 F. Supp. 1173, 1193, affirmed on other grounds, 2 Cir., 437 F.2d 619, affirmed, 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157. This view, of course, comports with common sense in that atypical claims presumably could not be adequately represented by a class represent-

ative unfamiliar or unconcerned with their peculiar characteristics.

■■ We are supported in our view that the lower court's decision was based upon due process considerations [6] by the fact that the major claims of Ohio were asserted and addressed under the Rule 60(b)(4) voidness of the judgment clause, and a judgment is not void merely because it is erroneous, but only if the court which rendered it lacked jurisdiction of the subject matter, or of the parties, or acted in a manner inconsistent with due process of law.[7] 11 Wright and Miller, Federal Practice and Procedure § 2862, at 199, 200. Jurisdiction not being challenged, the judgment could be attacked as void only on due process grounds and, indeed, the court couched. its 60(b)(4) consideration in terms of due process. 59 F.R.D. at 679.

■ The touchstones of due process in class actions have always been notice and adequacy of representation, but their interrelationship has never been completely and clearly articulated. Assuming the conclusion of the court below on the adequacy question to be correct, we must at the outset determine what if any impact the notice provided to Ohio had on its standing to argue a denial of due process under Rule 60(b).

The landmark due process decision in class action law is Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22. In that case the Supreme Court refused to give res judicata effect to a state court decision against certain ostensible class members who had not received notice and had not been adequately represented. The Court's due process analysis was centered around the question of adequacy of representation and the decision has subsequently been interpreted to establish adequate representation as a prerequisite for due process in class actions.[8] See, inter alia, Gonzales v. Cassidy, 5 Cir., 474 F.2d 67; Northern Natural Gas Co. v. Grounds, D.Kan., 292 F.Supp. 619; Dolgow v. Anderson, E.D. N.Y., 43 F.R.D. 472. It is important to note, however, that these cases are distinguishable from that presented here in that they involved either actions brought under sections other than 23(b)(3), with its built-in opportunity to opt out, or determinations as to whether a class action should be maintained in the first instance.[9] The present case involved a unique factual situation and requires a closer consideration of due process requirements.

In 1966 class action procedures were revised under Rule 23(c)(2) with respect to actions, such as the instant one, brought under Rule 23(b)(3). Recognizing the unique availability of exclusion under 23(b)(3) actions, the revised rule requires that the best practicable notice under the circumstances be sent to the members of the class advising them of their right to opt out or to enter an appearance in the action through counsel. The resulting judgment,

---

6. The "lulling effect" must be seen as only one more factor in the due process determination, especially in view of the fact that Ohio's neglect was deemed, properly we think, inexcusable under Rule 60(b)(1).

7. Bass v. Hoagland, 5 Cir., 172 F.2d 205, cert. denied 338 U.S. 816, 70 S.Ct. 57, 94 L. Ed. 494.

8. It is not entirely unfair to characterize this interpretation as overly broad. The Court did not say that both notice and adequate representation were necessary to satisfy due process. It is entirely feasible that the Court reached the adequacy issue because no notice had been given and was willing to enforce the prior state decision if adequacy

were present despite lack of notice. The question of whether notice itself would have been sufficient, it seems to us, was left unanswered. See also, e. g., Schrader v. Selective Service System Local Board No. 76 of Wisconsin, W.D.Wis., 329 F.Supp. 966, in which adequacy overcame the lack of notice.

9. In the Gonzales case, heavily relied on by Ohio, the court took pains to point out that the action was maintained under 23(b)(2) and not 23(b)(3) with its special notice requirements and opt-out provisions. "As a result of these distinctions class members in (b)(1) and (b)(2) actions must necessarily rely on the representative to protect their interests." 474 F.2d at 74 n. 12.

whether favorable or not, will bind all members who then fail to exercise the option to be excluded. By requiring this affirmative action by the absentee, the rule seeks to eliminate "one-way intervention," a practice common in "spurious"[10] class suits prior to 1966. Shane v. Northwest Indus., Inc., D.C.Ill., 49 F.R.D. 46; State of Minnesota v. United States Steel Corp., D.C.Minn., 44 F.R.D. 559.

■■ While adequacy of representation has been upheld as an extremely important factor in due process considerations in class actions and has, in fact, been deemed a prerequisite thereto under most circumstances, we do not feel bound in the instant proceeding by *Hansberry* and its progeny. For we consider here an action in which Ohio not only received notice of its inclusion within the designated class, with the concomitant right to opt out, but one in which Ohio was also apprised of the very terms of the impending judgment. It was thus presented with the unique opportunity of judging, retrospectively, whether its interests *had been* adequately represented at a time when it was capable of excluding itself if not satisfied. We do not feel that due process requirements under the facts presented here have yet been articulated.[11]

We are constrained to conclude that due process was satisfied here when Ohio received the notice and order delineating the terms of the proposed settlement and informing Ohio that it was a designated member of a class, that it had the opportunity to opt out or be represented by counsel, that it would be bound if it failed to opt out. In such a case, we conclude that due process may be satisfied by notice alone and that, where due process is thus satisfied, adequacy of representation need not be shown as a matter of constitutional necessity.

In reaching this conclusion we are guided by the purpose of the rule to prevent one-way intervention, the interests in the finality of judgments, and related case law precedent. To uphold the decision of the court below would, in our opinion, offer "a return to one-way intervention under a new guise." Philadelphia Elec. Co. v. Anaconda Am. Brass Co., D.C., 43 F.R.D. 452, 459. *See* Note, Collateral Attack on the Binding Effect of Class Action Judgments, 87 Harvard Law Review 589, 601. Defendants would be placed in the difficult position of having to go through complex litigation a second time against parties that would have participated in the judgment had it been favorable to them and, as appellants contend happened in the present case, the same arguments may be used against them which they had previously urged when they originally challenged the maintenance of the class action. The purpose of class actions is to avoid multiplicity of suits and upholding the decision of the court below would frustrate not only the interest in

---

10. A "spurious" suit was one in which the action was based solely on common questions. The judgment bound only the named parties and those who joined. 7A Wright and Miller, Federal Practice and Procedure § 1777, at 45. "One-way intervention" occurred when courts permitted absent parties to intervene after a decision favorable to their interests, even though an unfavorable decision would not have bound them.

11. In the recent case of Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732, dec. May 28, 1974, the Supreme Court extended the Rule 23(c)(2) best-practicable notice requirement to all 23(b)(3) class members who can be identified through reasonable effort. In response to the contention that adequacy of representation, rather than notice, was sufficient for due process, the Court responded: "We think this view has little to commend it. To begin with, Rule 23 speaks to notice as well as to adequacy of representation and requires that both be provided." The decision, however, preceded any judgment and concerned the question of whether the action could be maintained, and is thus, like the previous cases cited, factually distinguishable from this controversy. Moreover, the Court speaks to the requirements of the *rule*, and not the Constitution.

finality of judgments but also the interest in settlement of complex litigation.

Finally, we note that this is not the first time that a class member with notice has been bound by a judgment after failing to take some affirmative action. *See* Brennan v. Midwestern United Life Ins. Co., 7 Cir., 450 F.2d 999; Mungin v. Florida East Coast Ry. Co., M.D.Fla., 318 F.Supp. 720; School District of Philadelphia v. Harper & Row Publishers, Inc., E.D.Pa., 267 F.Supp. 1001; Supermarkets General Corp. v. Grinnell Corp., S.D.N.Y., 59 F.R.D. 512, affirmed, 2 Cir., 490 F.2d 1183. In Research Corp. v. Asgrow Seed Co., 7 Cir., 425 F.2d 1059, appellants, who had not been named class defendants but who had received notice, sought to appeal from a class settlement judgment. Appellants did not intervene or object to the settlement and the appeal was dismissed for reasons which we find particularly pertinent here:[12]

> However, in order to encourage or even to permit settlement, a person in disagreement with the terms of a settlement must take, at least, these minimal steps to preserve his right to appeal. Accordingly, since appellants had both actual and constructive knowledge of the settlement and since they took no steps to object to the settlement prior to the entry of judgment, the appeal must be dismissed. 425 F.2d at 1060–1061.

■ We find for similar reasons that the Rule 60(b) relief sought in the court below should have been denied. Under the particular facts here presented there has been no denial of due process.

The case is reversed and remanded with instructions to reinstate the judgment.

---

12. In Ace Heating & Plumbing Co. v. Crane Co., 3 Cir., 453 F.2d 30, the court considered the same issue as that presented in *Research Corp.* but concluded that it was not dispositive on the facts presented because appellants were members of a class so small that they had no litigable claims unless aggregated and that for those so situated the option to join in or opt out is in reality no option at all. They must accept, either nothing at all or a possibly unfair settlement, the court held, and thus had standing to appeal. No such mitigating circumstances are present here.