FREEDOM, N.Y., INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 86 Civ. 1363(MBM).

United States District Court, S.D. New York.

July 18, 2006.

Bruce M. Luchansky, Esq., Bruce M. Luchansky, P.A., Baltimore, MD, David S. Lande, Esq., David S. Lande, P.C., New York, NY, for plaintiff.

Michael J. Garcia, Esq., United States Attorney for the Southern District of New York, Ross E. Morrison, Esq., Assistant United States Attorney, New York, NY, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

In 1986, plaintiff Freedom, N.Y., Inc. ("Freedom"), a government contractor that assembled combat rations known as "Meals, Ready to Eat" ("MREs"), sued defendant the United States of America ("the Government"), alleging that the Government violated procurement laws and regulations when it awarded a contract for the assembly of MREs to Cinpac, Inc. ("Cinpac") instead of to Freedom. Then–Chief Judge Motley dismissed Freedom's action without prejudice for failing to join Cinpac, a necessary and indispensable party under Fed.R.Civ.P. 19. Now, 20 years later, Freedom moves to correct or, in the alternative, to vacate judgment pursuant to Fed.R.Civ.P. 60(b)(6). As explained below, Freedom's motion is futile because no fact advanced by Freedom would change the result reached by Judge Motley. The motion is also, and by far, untimely. Therefore, Freedom's motion in denied.

## I.

In 1985, the Defense Logistics Agency ("DLA"), an agency within the Department of Defense responsible for providing logistical support to the military, solicited bids for a contract to assemble MREs. (Am.Compl.¶¶ 5–8) This contract was known as the "MRE–6 contract," indicating that there had been five previous procurements (Def. Opp'n Mem. 4); the MRE–6 contract was awarded to Cinpac. (Am.Compl.¶ 18) Freedom protested that result administratively before filing a complaint for injunctive and declaratory relief in this court on February 14, 1986, and an amended complaint on April 25, 1986. (Pl. Am. Mem. 3; Ex. A to Morrison Decl.) Freedom also filed a motion for a preliminary injunction at the same time as the original complaint. (Ex. C to Morrison Decl.)

Freedom's amended complaint alleged that Cinpac was ineligible for the MRE–6 award because it failed to meet various legal requirements, and that the Government colluded with Cinpac to conceal this fact, falsifying multiple documents that supported and certified eligibility. (Am. Compl.¶¶ 19–38) One of the reasons alleged for Cinpac's ineligibility was that it did not qualify as a "manufacturer" as required by the Walsh–Healey Public Contracts Act, 41 U.S.C. § 35 *et seq.,* and corresponding regulations. (Am. Compl.¶¶ 29–34) The Government, alleged Freedom, "collaborated in a scheme involving a sham lease to create the appearance that Cinpac exercised exclusive and unrestricted control over the plant, facilities and equipment owned and operated by Star Foods in San Antonio, Texas." (*Id.* ¶ 32) Freedom sought a judgment that the Government's contract with Cinpac was

unlawful, and demanded that the Government be barred from paying Cinpac, as well as from taking any action to deprive Freedom of the opportunity to receive contracts. (*Id.* Wherefore Clause)

The Government filed a motion to dismiss under Fed.R.Civ.P. 19, arguing that Cinpac was a necessary and indispensable party. By order dated May 9, 1986, the Court granted the Government's motion and dismissed Freedom's amended complaint without prejudice, issuing a full opinion in support of the order on May, 27, 1986. *Freedom, N.Y., Inc. v. United States,* No. 86 Civ. 1363(CBM), 1986 WL 6163, (S.D.N.Y. May 27, 1986). It is from this order and opinion that Freedom now seeks relief.

The opinion explained that Cinpac was a necessary party under Fed.R.Civ.P. 19(a) because its absence would "impair or impede its ability to protect its own interests" for at least two reasons. *Id.* at *1. First, the Government might prove a less than "vigorous ally" if presented with evidence than Cinpac had lied in its eligibility statement. *Id.* Second, "[t]he crucial facts in [the] law suit pertain[ed] to Cinpac, itself, that is, to Cinpac's manufacturing capacity ... and to its conduct in representing itself to the government as a qualified bidder." *Id.* at *2. Cinpac was also necessary because the Government could face inconsistent obligations if the Court enjoined performance of the contract but the Government was still liable under the contract for Cinpac's costs and certain

profits. *Id.* The Court could not order that Cinpac be joined because of its lack of contacts with New York, and therefore had to consider whether Cinpac was indispensable under Rule 19(b). *Id.* The Court found that all four factors enumerated in that Rule supported indispensability: (1) Cinpac risked significant prejudice both because the Government could "not be counted upon to represent Cinpac's interests to the end" and because "the determinative factual" issue in this case—whether Cinpac was a qualified bidder—hinge[d] on Cinpac's own industrial capacity and the truthfulness of its application, evidence which Cinpac, itself, [was] in the best position to develop; (2) it was impossible to shape judgment to avoid prejudice to Cinpac because of the relief sought by Freedom; (3) a judgment for Freedom rendered in Cinpac's absence would not be "adequate" because Cinpac could sue the Government for vindication of its perceived contractual rights; and (4) Freedom possessed an adequate alternative remedy in the event of dismissal, in that it could recommence suit against the Government and Cinpac in either Ohio or Pennsylvania. *Id.* at *3.

Among the evidence before the Court was an affidavit by Frank Bankoff, a Contracting Officer with the Defense Personnel Support Center ("DPSC"), a component of the DLA.[1] (Ex. 1 to Pl. Am. Mem.) Bankoff was "DPSC Procuring Contracting Officer" for MRE–6 contract. (*Id.* ¶ 1) In the affidavit, dated March 14, 1986, Bankoff asserted that Cinpac was properly

---

1. Freedom treats Bankoff's affidavit as if it had been submitted in support of the Government's motion to dismiss under Rule 19. (Pl. Am.Mem.3) The affidavit itself states that it was made "in opposition to plaintiff's pending motion for a preliminary injunction." (Ex. 1 to Pl. Am. Mem. ¶ 1) The docket sheet shows that Bankoff's affidavit was filed on March 14, 1986, and that the Government did not file notice of a motion to dismiss until April 28, 1986. (Ex. A to Morrison Decl.) The Court had at its disposal Bankoff's affidavit when deciding the Rule 19 motion even if the affidavit was not provided expressly for disposition of that motion. Consequently, Freedom's apparent mischaracterization of the affidavit's timing, whether born of confusion or obfuscation, does not bear upon the disposition of the motion now before this court.

qualified as a "manufacturer" under Walsh–Healey. (*Id.* ¶¶ 18–20) Freedom claims that "Bankoff's statements ... were deliberate lies intended to induce [the] Court into helping him hurt Freedom," but that it "did not have sufficient evidence to demonstrate that Bankoff flatly was lying." (Pl.Am.Mem.4)

Freedom did not appeal or seek reconsideration of the May 27, 1986, opinion; nor did it file suit in Ohio or Pennsylvania as suggested by the Court. Freedom claims that, following dismissal of its case, Bankoff "proceeded unlawfully to push Freedom out the MRE program" by ensuring that Freedom's bid for a subsequent MRE contract ("MRE–7") failed and by wrongfully terminating for default an existing MRE contract ("MRE–5") between Freedom and the Government. (*Id.* at 4) Freedom claims that these actions drove it from the MRE program and destroyed it as an active business, causing hundreds of layoffs, lasting reputational damage, and vast financial harm. (*Id.; Id.* at 15–18)

Freedom allegedly "spent the next two decades bogged down in litigation with the Government seeking to correct these wrongs," and that the Armed Services Board of Contract Appeals ("ASBCA") has since vindicated Freedom's position regarding the termination for default of the MRE–5 contract, although the appeals process continues. (*Id.* at 5) Freedom claims that at some point during the 20 years of litigation since the May 27, 1986, opinion, it came into possession of two documents that "demonstrate[ ] conclusively that Bankoff lied to this Court in his Affidavit, and that Bankoff failed to disclose information that would have changed the outcome of this Court's decision." (*Id.* at 6)

The first document is a March 11, 1986, letter by the Chief of the Operational Ra-

tions Section of the DPSC responding to a protest made to Bankoff by another government contractor, So–Pak–Co, against the designation of Star Foods as a "manufacturer" under Walsh–Healey following solicitations for a number of contracts for MRE component parts. (Ex. 2 to Pl. Am. Mem.) So–Pak–Co's protest was based on the same lease between Cinpac and Star Foods that Freedom described as a "sham" in its amended complaint, and Freedom attached a copy of So–Pak–Co's protest as an exhibit to its motion for a preliminary injunction filed in February 1986. (Ex. C to Morrison Decl.) The response to So–Pak–Co's protest stated that "[n]o basis was found to conclude that the lease agreement ... encroached upon Star Foods' overall manufacturing capability" and "Star Foods [was] indeed ... capable of manufacturing on its own premises the supplies called for under the referenced solicitations." (Ex. 2 to Pl. Am. Mem. 01758–59) Freedom alleges that "[t]he issue was simple—either Cinpac was using the Star Food's facility and Cinpac could receive an MRE award, or Star Food was using Star Food's own facility and Star Food could receive an MRE award"; thus, the letter proves that "Cinpac did not, in fact, have control over the Star Food plant" sufficient to qualify as a "manufacturer." (Pl. Reply Mem. 3) Freedom does not specify when or how it obtained this letter, stating generally that "Freedom only discovered the hidden evidence more than one year after Judge Motley's decision." (*Id.* at 14)

The second document is a May 23, 1986, letter from the Department of Labor ("DOL") to DPSC that makes a "final determination" as to whether Cinpac qualified as a "manufacturer" under Welsh–Healey. (Ex. 3 to Pl. Am. Mem. 01927) The letter was DOL's response to an inquiry by DPSC after Freedom and another gov-

ernment contractor had protested award of the MRE–6 contract to Cinpac. (*Id.*) In the letter, DOL stated that Cinpac did not qualify as a "manufacturer" because the lease with Star Foods did not allow Cinpac "the complete and unrestricted use and control of the manufacturing space and equipment as required" by regulation. (*Id.*) Again, Freedom does not specify when or how this letter came into its possession. (*See* Pl. Reply Mem. 14) However, Freedom's president, Henry Thomas, referred to the underlying DOL determination in a letter to Bankoff dated September 19, 1990 (Ex. A to Hallam Decl. 3), and in a complaint to the ASBCA filed on May 27, 1998, concerning the MRE–5 contract (Ex. B to Hallam Decl. ¶ 21).

In support of Freedom's efforts to be reinstated into the MRE program, several members of Congress have written letters to the DLA. In a July 25, 2005, response to an inquiry about Freedom's situation from Representative Jo Bonner, Vice Admiral Keith W. Lippert, Director of the DLA, stated that "no court or board has ruled that Freedom is entitled to reinstatement." (Ex. H to Pl. Reply Mem.) He mentioned also that Freedom had "unsuccessfully challenged" the decision to award the MRE–6 contract to Cinpac in U.S. District Court. (*Id.*) Freedom claims that these comments reveal that "the dispute over Bankoff's and Cinpac's violation of the MRE–6 solicitation still is very much alive in the minds of DLA officials." (Pl. Reply Mem. 12)

On January 23, 2006, Freedom filed this motion to correct or, in the alternative, to vacate the 1986 dismissal of its action pursuant to Fed.R.Civ.P. 60(b)(6).

## II.

Rule 60(b) provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or (6) any other reason justifying relief from the operation of judgment. Fed.R.Civ.P. 60(b).

The Rule then places time constraints on such motions. "The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken." *Id.*

▮▮▮ Rule 60(b) "is designed to 'strike[ ] a balance between serving the ends of justice and preserving the finality of judgments.'" *Batac Dev. Corp. v. B & R Consultants Inc.*, No. 98 Civ. 721(CSH), 2000 WL 307400, at *3 (S.D.N.Y. Mar.23 2000) (*quoting Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir.1986)). "A motion for relief from judgment is generally not favored and is properly granted only upon a showing of exceptional circumstances." *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir.2001); *accord Gordon v. City of N.Y.*, 228 F.R.D. 515, 516 (S.D.N.Y.2005). The moving party bears the burden of proof. *Int'l Bhd. of Teamsters*, 247 F.3d at 391; *Am. Tissue, Inc. v. Arthur Andersen L.L.P.*, No. 02 Civ. 7751(SAS), 2005 WL 712201, at *2 (S.D.N.Y. Mar.28, 2005). In addition to demanding that the movant show "exceptional circumstances," "the courts of this circuit also require that the evidence in support of the motion be highly convincing, that the movant show good cause for the failure to act sooner, and that no undue

hardship be imposed on the other parties as a result." *Greenberg v. Chrust*, No. 01 Civ. 10080(RWS), 2004 WL 585823, at *3 (Mar. 25 2004) (*citing Kotlicky v. U.S. Fidelity & Guar. Co.*, 817 F.2d 6, 9 (2d Cir.1987); *Williams v. N.Y. City Dep't of Corr.*, 219 F.R.D. 78, 84 (S.D.N.Y.2003); and *Kellogg v. Strack*, No. 96 Civ. 2118(DLC), 2000 WL 565189, at *2 (S.D.N.Y. May 8, 2000)).[2]

### III.

#### A. Highly Convincing Evidence

"Generally, courts require that the evidence in support of the motion to vacate a final judgment be 'highly convincing' . . . ." *Kotlicky*, 817 F.2d at 9 (*quoting United States v. Cirami*, 563 F.2d 26, 33 (2d Cir. 1977)). I am not convinced, highly or otherwise, that the evidence now presented by Freedom would have led Judge Motley to change her conclusion that Cinpac was an indispensable party.

■ Freedom alleges that the May 27, 1986, opinion was based on "the Court's belief that a genuine dispute existed whether Cinpac qualified as a manufacturer" and that, had the Court known of the DOL determination letter, "the factual dispute which formed the core of the Court's concern would have disappeared."[3] (Pl. Reply Mem. 4–5) Freedom appears to overstate the extent to which the DOL's letter would have resolved all controversy over Cinpac's status. Freedom claims that "the Secretary of Labor's determination on this issue [was] conclusive" under Walsh–Healey and corresponding regulations (Pl. Am.Mem.13), but Freedom does not explain why that determination would have been unchallengeable and unassailable if, for example, Cinpac believed that it had been the victim of fraud by the Government. Thus, the "factual dispute" over Cinpac's eligibility would not have disappeared completely, and in any event Cinpac had a right to be heard before the significance *vel non* of the DOL letter was determined.

Moreover, Judge Motley found that Cinpac risked significant prejudice, not only because it was "in the best position to develop" evidence as to its "industrial capacity and the truthfulness of its application," but also because "the Government could not be counted upon to represent Cinpac's interests to the end." *Freedom*, 1986 WL 6163, at *3. A DOL determination that Cinpac did not qualify as a "manufacturer" would have transformed this risk of conflicting positions into a certainty. Further, Freedom gives no reason why the three other factors in addition to prejudice that the Court found supported dismissal under Rule 19(b) would have been affected by the DOL letter. Judg-

---

**2.** Freedom cites *Kotlicky v. United States Fidelity & Guaranty Co.*, 817 F.2d 6 (2d Cir. 1987), for the propositions that courts should "liberally exercise" their powers under Rule 60(b) "because of the strong judicial policy in favor of hearing claims on their merits" and "all doubts must be resolved in favor of granting the motion to set aside the judgment." (Pl.Am.Mem.6–7) *Kotlicky* involved a dismissal under Fed.R.Civ.P. 37 for failure to appear at a deposition. 817 F.2d at 8. Any leniency with which that Court regarded the granting of a Rule 60(b) motion for relief from a default judgment should be confined to circumstances when such a judgment is at issue.

See 12 Moore's Federal Practice § 60.22[3] (Matthew Bender 3d ed.) (discussing the distinctive way that courts treat motions for relief from default judgments). In other circumstances, the prevailing wisdom that "a court may not lightly invoke the 'extraordinary judicial relief' of annulling a final judgment" should control. *Batac Dev. Corp.*, 2000 WL 307400, at *3 (*quoting Nemaizer*, 793 F.2d at 61).

**3.** Freedom does not explain how the DLA letter to So–Pak–Co would have mooted, rather than exacerbated, the dispute.

ment could not have been shaped to avoid prejudice to Cinpac; Cinpac could have sued the Government subsequent to a decision in Freedom's favor; and Freedom had alternative remedies available through suit in Ohio or Pennsylvania. *See id.*

## B. Mutual Exclusivity of Rule 60(b) Clauses

Freedom brings its motion under Rule 60(b)(6), the Rule's "any other reason" clause. This court must determine whether the ground upon which Freedom seeks relief must be asserted in a motion under one of the Rule's first three clauses, and is thus subject to the one-year time limitation imposed on motions based on reasons in clauses (1), (2), and (3).

In *United States v. International Brotherhood of Teamsters,* the Second Circuit stated that "if the reasons offered for relief from judgment can be considered in one of the more specific clauses of Rule (60)(b), such reasons will not justify relief under Rule 60(b)(6)." 247 F.3d at 391–92; *accord Am. Tissue, Inc.,* 2005 WL 712201, at *2. If clause (6) were not mutually exclusive of the other clauses, a party's artful motion practice could render meaningless the one-year time limitation on clauses (1), (2), (3). "[A] party 'cannot circumvent the one year limitation applicable to clauses (1), (2), and (3) by invoking the residual clause (6) of Rule 60(b).'" *Thompson v. The City of Mount Vernon,* No. 93 CV 4788(LAP), 2002 WL 562653, at *2 (S.D.N.Y. Apr.15 2002) (*quoting Serzysko v. Chase Manhattan Bank,* 461 F.2d 699, 702 (2d Cir.1972)); *see also Greenberg,* 2004 WL 585823, at *3 n. 6 ("A party may not depend on the broad 'any other reason' provision of Rule 60(b)(6) where the basis for the Rule 60(b) motion may be construed under any other clause of Rule 60(b).").

■ Despite the wealth of precedent to the contrary, Freedom insists that the Rule 60(b) clauses identifying specific grounds for relief and the clause allowing relief for "any other reason" are not mutually exclusive, and that the choice to proceed under Rule 60(b)(6) or one of the other clauses belongs to the movant alone. (Pl. Reply Mem. 13) Freedom cites *Arthur Andersen & Co. v. State of Ohio (In re Four Seasons Sec. Laws Litig.),* 502 F.2d 834 (10th Cir.1974), and *MTB Bank v. Federal Armored Express, Inc.,* No. 93 Civ. 5594(LBS), 1998 WL 43125 (S.D.N.Y. Feb.2, 1998). Leaving aside that both of these cases were decided before the Second Circuit's holding of mutual exclusivity in *International Brotherhood of Teamsters, Four Seasons* and *MTB Bank* are irrelevant to the present controversy. They presume only that when a party moves for relief under Rule 60(b) *within* one year following judgment, so that the absolute time constraints on the first three clauses are immaterial, "the court should not be bound by a strict categorization of particular claims." *Four Seasons,* 502 F.2d at 841; *accord MTB Bank,* 1998 WL 43125, at *9 ("[W]here ... a motion is timely filed under any of the clauses of Rule 60(b), the Court will not be bound by a strict categorization of the particular claims, and may appropriately aggregate claims under the various provisions." (internal quotation marks omitted)). Freedom offers no case, nor has this court found one, questioning the exclusivity of clauses under Rule 60(b) when a motion is made more than a year after judgment.

■ Thus, unless the grounds for Freedom's motion can be construed as anything other than the reasons enumerated in Rule 60(b)'s first three clauses, the motion is time-barred. Freedom states plainly that it now seeks relief from the 1986 dismissal because it has acquired documentation

that allows it to "prove that Bankoff defrauded this Court." (Pl.Am.Mem.6) Undeterred by the obvious conclusion that its motion can be construed under Rule 60(b)(2), which allows relief based on newly discovered evidence, or Rule 60(b)(3), which allows relief based on fraud, Freedom argues that Rule 60(b)(6) is the proper vehicle for bringing a motion based on newly discovered evidence or fraud that does not come to light until after the one-year restriction on the other clauses has run. (Pl. Reply Mem. 14) Freedom asserts that if the one-year restriction applied to evidence and fraud that a party did not know existed until more than a year had passed, "any person committing a fraud or perjury or hiding documents would have free reign after one year." (*Id.*) In other words, the Rule would reward those perjurers most adept at covering their tracks. Freedom's argument is unconvincing.

■ First, Freedom provides no case law to support this contention. Second, the plain language of clauses (2) and (3) creates no exception for evidence or fraud discovered more than a year after judgment. Third, Freedom overstates the extent to which Rule 60 exonerates skilled liars after a year. The Rule "does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, ... or to set aside a judgment for fraud upon the court." Fed.R.Civ.P. 60(b).

## C. Reasonable Time

■ Further discussion of whether Freedom's motion is properly characterized as a Rule 60(b)(6) motion would be an unnecessary academic exercise. Rule 60 states that all motions "shall be made within a reasonable time," and Freedom's delay in bringing this motion has been manifestly unreasonable. "In considering whether a Rule 60(b)(6) motion is timely, [courts] must scrutinize the particular circumstances of the case, and balance the interest in finality with the reasons for delay." *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 897 (2d Cir.1983); *accord Broadway v. City of N.Y.*, No. 96 Civ. 2798(RPP), 2003 WL 21209635, at *3 (S.D.N.Y. May 21, 2003). Courts in this circuit "have been unyielding in requiring that a party show good reason for his failure to take appropriate action sooner." *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, No. 86 Civ. 9671(JSM), 1992 WL 51567, at *6 (S.D.N.Y. Mar.9, 1992) (*quoting United States v. Martin*, 395 F.Supp. 954, 961 (S.D.N.Y.1975)) (internal quotation mark omitted).

■ As a matter of common sense, a movant, like Freedom, that does not provide basic information that would allow the court to discern when the alleged grounds for Rule 60(b) relief were discovered cannot show that it has brought its motion within a reasonable time. Even if Rule 60(b)(6) allowed motions based on evidence of fraud that had not been discovered within a year after judgment, Freedom fails to offer any evidence of when it actually did come into possession of the documents it puts such stake in, and does not explain why, with even a modicum of diligence, it could not have obtained those documents earlier, even within one year of judgment. Freedom included in its February 1986 motion for a preliminary injunction a copy of So–Pak–Co's protest against Star Food's designation as a "manufacturer"; the response letter from DPSC was sent to So–Pak–Co, not written for internal purposes and concealed from the world. (Ex. 2 to Pl. Am. Mem.) Freedom gives no indication that it ever inquired after this "smoking gun" (Pl. Reply Mem. 2) or that, if it did, So–Pak–Co colluded in the alleged conspiracy between the Government and

Cinpac by deceiving Freedom as to the letter's existence. Nor does Freedom claim that it took the logical step of seeking out the DOL letter rejecting Cinpac's status as a "manufacturer." If, as Freedom describes, the DOL's determination is conclusive under Walsh–Healey and corresponding regulations (Pl.Am.Mem.13), it is mystifying that Freedom never took the slightest action to find out if the DOL had considered the matter.

In response to Freedom's silence regarding when and how it obtained the two documents, the Government offers evidence that Freedom knew at least the substance of the DOL's determination letter as early as 1990. In a letter to Bankoff regarding Freedom's ability to act as an additional MRE contractor during Operation Desert Shield, Henry Thomas, Freedom's president, referenced "the illegal award to Cinpac . . ., who was not eligible under the Walsh Healey Public Contracts Act to receive an MRE award, as was determined by the U.S. Dept. of Labor." [4] (Ex. A to Hallam Decl. 3) Freedom never explains why it then waited more than 15 years to seek relief from the 1986 judgment.

That "[f]or 'nearly two decades,' Freedom has sought relief before agency boards, the GAO and the Federal Courts to correct the contract injustices [it] has suffered, including the wrongful Cinpac awards," (Pl. Reply Mem. 6) makes it all the more puzzling that Freedom delayed so long in seeking relief from judgment in the one lawsuit directly challenging the award of the MRE–6 contract to Cinpac. Moreover, this record undermines Freedom's claim that the DLA's response to

Rep. Bonner's inquiry suddenly revealed the 1986 judgment's import, prompted this motion, and excused at least 15 years of inactivity. (*Id.* at 15–16)

Freedom also argues that its delay in pursuing a Rule 60(b) motion was not unreasonable because the Government was at all times, by statute and regulation, under a continuing duty to correct violations of Walsh–Healey. (*Id.* at 15) If the Government has engaged in any unlawful acts by "failing to initiate an investigation and prosecution" of Walsh–Healey violations, then an aggrieved party might be able to sue the Government for those acts. But the Government's legal obligations do not explain why Freedom waited to bring this motion. In fact, they make Freedom's delay in pursuing a Rule 60(b) motion— waiting for relief in the face of repeated, allegedly unlawful indifference—all the more irrational.

\*　　\*　　\*　　\*　　\*　　\*

For the reasons set forth above, Freedom's motion is objectively frivolous and is denied.

SO ORDERED.

---

4. Following mention of the DOL determination, Thomas's letter cites to an attachment, but that attachment is not included in the Government's submissions to this court. Thus, it is impossible to know whether the attachment is the exact DOL letter that undergirds Freedom's motion. Nonetheless, Thomas's comment shows that Freedom had evidence that in substance would have allowed it to bring this motion in 1990.