**In re PRUDENTIAL SECURITIES INCORPORATED LIMITED PARTNERSHIPS LITIGATION.**

MDL Docket No. 1005.
M21–67 (MP).

United States District Court,
S.D. New York.

Feb. 1, 1996.

## OPINION

MILTON POLLACK, Senior District Judge:

Before the Court are various motions by Class Members for the Court to use its discretionary power under Fed.R.Civ.P. 6(b), 60(b) and 23(d) to allow them additional time to opt-out from the class and/or declare them excluded from the Class.[1]

### Background

On April 14, 1994, the Judicial Panel on Multidistrict Litigation ("JPML") entered an order transferring to this Court several class actions which arose out of the alleged fraudulent marketing and sale of limited Partnership interests by Prudential Securities Incorporated ("PSI" or "Prudential").

On May 19, 1994, this Court entered an order which consolidated the Constituent Actions for pre-trial purposes and authorized the plaintiffs to serve a consolidated complaint.

On June 8, 1994 plaintiffs served a detailed multi-volume Consolidated Complaint, which asserted numerous RICO claims, as well as state law claims. The Consolidated Complaint alleged that approximately 700 limited Partnerships were uniformly organized, marketed, sold and operated as part of a massive and continuing scheme to defraud investors. PSI and its co-sponsors allegedly marketed and sold the Partnerships as safe, conservative investments suitable for Individual Retirement Accounts, elderly and retired investors and those investors who sought safety of principal as a primary investment objective despite the known investment risks.

On December 20, 1994, in connection with a Motion to Dismiss Plaintiffs' Consolidated Complaint, PSI submitted an extensive brief which included prospectuses and summaries of prospectuses, purporting to show that all of the risks of investment were disclosed. PSI argued that investors were on inquiry notice from the outset of their investments and that most claims were, therefore, time-barred. PSI also argued, *inter alia,* that the "bespeaks caution" doctrine required dismissal of the Consolidated Complaint. Among the legal issues raised by the various motions to dismiss and plaintiffs' responses were: statute of limitations, equitable tolling, laches, the "bespeaks caution" doctrine and inquiry notice. These issues created risks on both sides of the litigation.

On October 21, 1993, the SEC had filed a complaint against PSI in the United States District Court for the District of Columbia, and simultaneously PSI consented to the entry of a final order by that court.

The final order in the SEC's proceeding required PSI to pay compensatory damages for all valid claims presented through a court-supervised Claims Resolution Process. PSI consented, among other things, to pay $330 million to establish a fund ("The SEC Fund") for the benefit of defrauded investors and to pay all additional claims in excess of the $330 million in the SEC Fund. The SEC Fund was placed under the general supervision of the United States District Court for the District of Columbia to be administered by its court-approved Claims Administrator.

The Claims Resolution Process had two parts. The first part of the process required eligible investors to submit claims directly to PSI. Pursuant to that process, PSI was obligated either to offer the claimant a monetary settlement or reject the claim. Investors who were not satisfied with PSI's offers of compensation, or whose claims were rejected, had the option to pursue their legal rights in other forums. Alternatively, they could enter the second part of the process: the mandatory arbitration referred to as "EDAP" (Expedited Dispute Arbitration Procedure). Election to participate in and the results of the mandatory arbitration were to be final and binding on the parties. Investors who were members of previously certi-

---

1. This Opinion supplements Orders entered in this docket Nos. 41, 43, 44, 45, 46, 47, 48, 49, 50, 52, 57 and appropriate entry hereof shall be indicated in regard to said Orders on the docket, as well as the unnumbered Order dated Novem- ber 29, 1995 endorsed by Memorandum relating to Class Members Matus and Nilson and the unnumbered Order dated December 6, 1995 endorsed by Memorandum relating to the motion of Class Members Greenberg and Zackroff.

fied class actions were not permitted to participate in the SEC Fund.

As an essential feature of the SEC Claims Resolution Process, PSI agreed not to assert any statute of limitation defenses with respect to any claims submitted on behalf of eligible investors. This was a significant agreement in that many of the purchases involved went back 10 or more years from the date of the litigation. Even those investors who would be time-barred from bringing a securities action for compensatory damages in another forum were allowed to submit claims within the Claims Resolution Process, including the EDAP. However, investors who wished to avail themselves of the SEC Fund process had to fill out a detailed questionnaire and file it with PSI in the Claims Resolution Process on or before January 10, 1995.

While the SEC Claims Resolution Process provided a valuable and (because statute of limitations defenses were waived, although other defenses were not) virtually riskless means of recovery for many injured limited Partnership investors who had not previously settled with PSI or otherwise had their claims adjudicated, or who had had their claims against PSI previously dismissed solely on statute of limitations grounds, many investors chose not to participate. Some of the reasons suggested were that the personal information requested by PSI in order to determine a claimant's suitability was viewed by some as a burdensome intrusion, and that others may have found the claim forms and procedure intimidating. Some investors were offered little or nothing in the way of compensation by PSI, which determined, under the Claims Administrator's oversight, that these investors were sophisticated, that the investments were suitable or that the investor was otherwise undeserving of compensation. Some investors, faced with a choice between what they regarded as an unacceptably low offer from PSI and the prospect of possibly hiring counsel and proceeding to EDAP, simply declined to proceed. Other investors either failed to learn of the SEC Claims Resolution Process, or missed the deadline. Those limited partnership investors whose claims remained unresolved were included in the Settlement Class in MDL 1005 and were eligible participants in the Settlement with which we are involved herein if their claims were still extant after the SEC Claims Resolution Process (and any other settlements) had not terminated their claims. The Settlement in this case represented the only last ditch available remedy for claims which would not have any value but for the threat perceived by PSI to have resulted from plaintiffs' counsel's exceptional efforts to reach the Settlement herein.

On August 9, 1995, after several failed starts, the parties hereto finally negotiated remaining details and executed a Stipulation of Settlement which was the culmination of the negotiation process begun long before.

The Stipulation entered into on August 9, 1995, provided that the PSI Settling Defendants will pay $110 million into a Settlement Fund for the benefit of the Class. The Stipulation provided that the claims of all Class Members relating in any way to the marketing, purchase, sale, or holding of units, or other interests in, or to the operation, oversight, monitoring or management of any of the Partnerships, would be released and dismissed on the merits and with prejudice as against the PSI Settling Defendants and other Released Parties. The litigation was to continue against the Non–Settling Defendants. The Settlement benefited those Class Members who had not previously released the PSI Settling Defendants as a result of their participation in the SEC Claims Fund Procedure, including EDAP, and who had not previously had their claims against the PSI Settling Defendants settled or adjudicated in litigation or arbitration or as a result of prior class actions affecting investors in the particular Partnerships in which they held Units and from which they did not opt-out. Like the SEC proceeding, it once again gave investors who might have been statutorily barred from bringing an action for compensatory damages the opportunity to obtain a recovery against the Settling Defendants.

A significant and fundamental agreement made as part of the Settlement Agreement in the negotiations was a so-called "blow" provision. The concept of a blow provision was that while the Settling Defendants were per-

fectly willing to make a global disposition to reach finality, if they could not reach finality with opt-outs who had excluded themselves from the Settlement except for a stipulated agreed dollar resolution of claims, the Settling Defendants were not interested in going forward because they were still facing the expense and the burden of multi-faceted cases all around the country. It was stipulated as part of the proposed Settlement that if $10 million in claims excluded themselves by opting-out from the Settlement proposed, Prudential had the right to walk away from the $110 million Settlement. This would mean that the 340,000 potential Class Members would get zero from Prudential by way of this Settlement. That was a right Prudential bargained for and insists must be implemented on these motions seeking relief from the opt-out terms. In effect, the Settling Defendants were willing to pay a prospective $120 million: $110 million was paid in cash on the Settlement proposed in Court and the Settling Defendants recognized they might have to pay as much as $10 million more to cover open claims to be subsequently litigated with the opted out claimants. PSI has asserted that it does not think that the opt-outs will ultimately present $10 million of valid claims; PSI believes that it will win those cases, but it recognizes the other possibility. PSI was given the opportunity to look at the blow provision list. PSI had to look at the opt-out list which identified the various claims that had opted out; it had to go through those claims one by one and make its analysis of how much each claim was worth, and assess what, in PSI's view, was the likelihood that the claim would be successful. In other words, if it determined that more than $10 million was realistically represented by claims that had opted out, the blow provision would entitle the withdrawal of the $110 million proposed settlement. PSI faced and made a business decision. After scrutiny of all claims of all those who had timely excluded themselves from the Settlement, PSI decided to remain bound to it. Consequently, it was of significant importance to Prudential to know—as of the effective date of the blow provision—exactly what it was facing and whether to go forward with the

$110 million Settlement which was extremely beneficial to the Class.

The so-called blow provision provided in the Settlement was as follows: PSI, at its sole discretion, had the right to terminate the Settlement if requests for exclusion were validly filed by Class Members whose losses, with respect to investments in Partnerships offered and sold after 1986, exceeded $10 million, including interest. If PSI elected to terminate the Settlement pursuant to this paragraph, the Court and Lead Class Counsel were to be notified no more than seven (7) calendar days after the deadline set in the Preliminary Approval Order for the receipt of requests for exclusion. If at 5:00 p.m. on the day prior to the Settlement Fairness Hearing (after efforts by Lead Class Counsel to minimize the number of opt-outs), the aggregate of such Out-of-Pocket Losses did not exceed $10 million, then the election by PSI to terminate under this paragraph was to become null and void.

The impact of now extending the date to opt-out, would be to radically change the value to PSI of the Settlement. That would significantly prejudice PSI.

On August 29, 1995 this Court certified for settlement purposes a proposed class, defined as all persons or entities, acting in their own capacity or in a representative capacity, who either:

(a) purchased units in any Partnerships or other entities listed on Schedule 1 [to the Stipulation] between January 1, 1980 and June 8, 1994 (the "Settlement Class Period"), on their initial offerings or in the secondary market, or (b) purchased from or through PSI on their initial offerings or in the secondary market, Units in any of the Partnerships or other entities listed on Schedule 2 [to the Stipulation] during the Settlement Class Period.

163 F.R.D. 200, 207. The proposed Class definition excluded persons or entities whose claims had been released, the Partnerships, defendants and the individual defendants' immediate families. Also excluded were individuals who had effectively agreed to participate in and be bound by EDAP by complying with the procedures of the SEC Claims Administrator in the SEC Fund, which provided

that the SEC Fund and its expedited arbitration procedures would be the sole forum for resolution of those individuals' claims.

At this same hearing, the Court approved of the form and content of notice to be provided to absent Class Members, and directed that such notice be provided to absent Class Members in the manner set forth in the proposed Order. The proposed Notice was drafted by the settling parties to provide Class Members with a fair understanding of the actions, the parties and the nature of the Settlement and was approved by the Court (after revisions suggested by the Court) prior to its mailing and publication. It contained the following provisions:

If you are a Class Member, you have a choice as to whether or not to remain a member of the Class ... (a) If you do nothing you automatically remain a Member of the Class ... You will not be able to commence or continue any other litigation, arbitration or other claims against any PSI Settling Defendant in any other forum with respect to the settled claims ... (b) If you want to exclude yourself from the Class and not be included as a Class Member, the Court will exclude you ... only if you submit a written request for exclusion. To be effective, the written request for exclusion must be signed ... must be mailed ... so as to be received no later than October 30, 1995 ... If you wish to be eligible to receive your share of the net settlement pool, do not file a request for exclusion.

If you request exclusion, you will not be entitled to receive any payment from the Partial Settlement proceeds ... If you have not yet filed such a law suit or arbitration and are considering exclusion, you should consult with your own attorney before requesting exclusion, because the Partial Settlement may be your only chance to recover a portion of your loss.

If you are eligible for inclusion in the Class and do not request exclusion in the manner and within the time described above, you will automatically be included as a Class Member and the proposed Partial Settlement (if and when approved by the Court), all orders or judgments issued by the

Court in this litigation and any release given in connection with the Partial Settlement, will be binding upon you.

The Notice also specifically informed Class Members, "If you have pending your own claim or action against any person or entity in connection with an investment in any of the Partnerships (as defined below), you should consult with the attorney representing you, as this Consolidated Action, the certification of the Class, the proposed partial Settlement and this notice may affect your claim or your action." Immediately thereafter, the Notice stated in bold letters: "THE RELEASE TO BE GIVEN TO THE PSI SETTLING DEFENDANTS AND THE RELEASED PARTIES IS VERY BROAD AND MAY IMPACT UPON OTHER RIGHTS OR CAUSES OF ACTION YOU HAVE."

The notice procedure approved by this Court included: 1) mailing the Notice to all Class Members who could be identified with "reasonable effort" by Lead Class Counsel with the cooperation of the PSI Settling Defendants by making their books, records and information available to Lead Class Counsel ("Class Notice"); and publishing the Notice in the national editions of *The Wall Street Journal, The New York Times*, and *U.S.A. Today* by Lead Class Counsel twice within ten days of the Class Notice mailing ("Published Notice"). Both the Class Notice and Published Notice informed Class Members of the necessity to opt-out by October 30, 1995 if a Class Member desired to proceed individually with his or her claims against any of the Settling Defendants or Released Parties.

On November 17, 1995, this Court held a fairness hearing on the proposed Stipulation and Agreement of Partial Compromise and Settlement dated August 9, 1995 and the Amended Plan of Allocation dated September 8, 1995 and on the Joint Fee Petition of plaintiffs' class counsel. None of the movants now seeking an extension of the deadline to opt-out appeared at the Fairness Hearing.

On November 20, 1995 this Court entered Findings of Fact and Conclusions of Law with respect to the Settlement and Amended Plan of Allocation. On November 20, 1995

this Court also entered an Order and Final Judgment approving the Settlement relative to plaintiffs' and the Class' claims against the PSI Settling Defendants, and an order and Final Judgment Approving the Amended Plan of Allocation. Thereafter, various investors who, by virtue of their inclusion within the Class definition and through their failure to opt-out by the October 30, 1995 deadline, have now been deemed Class Members who are barred from pursuing their claims against PSI in other forums, have moved the Court to grant them extraordinary relief from the Final Order, and permission to opt-out beyond the established deadline.

### Discussion

In the pre-eminent case concerning the adequacy of class notice to absent class members, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), the Supreme Court stated that due process is met through "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Individual notice is to be sent to "all class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974). It is widely recognized that for the due process standard to be met it is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected. *Weigner v. The City of New York*, 852 F.2d 646, 649 (2d Cir.1988), cert. denied, 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989) ("[t]he proper inquiry is whether [class counsel] acted reasonably in selecting means likely to inform persons affected, not whether each [class member] actually received notice"); *Silber v. Mabon*, 18 F.3d 1449, 1453–54 (9th Cir.1994); *In re VMS Limited Partnership Sec. Litig.*, No. 90 C 2412, 1995 WL 355722 at *2 (N.D.Ill. June 12, 1995); *Trist v. First Federal Savings & Loan Assoc. of Chester*, 89 F.R.D. 1, 2

(E.D.Pa.1980) ("*Mullane* has never been interpreted to require the sort of actual notice demanded by the defendants, but rather only notice reasonably calculated to apprise interested parties of the nature of the object"). The Court is granted the power to direct the means of providing notice, subject only to these broad "reasonableness" standards imposed by due process. *Grunin v. International House of Pancakes*, 513 F.2d 114, 121 (8th Cir.) cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

This Court's August 29, 1995 Order required Class Counsel to send a copy of the Class Notice to each Class Member whose address could reasonably be located by first-class mail, and to publish a summary notice on two separate occasions in national editions of *The Wall Street Journal, The New York Times,* and *U.S.A. Today.* In complying with this Order, Class Counsel had notice mailed to each identifiable Class Member's last known address, a procedure that has been given wide-spread approval in other class actions. *See, e.g., Grunin,* 513 F.2d at 121 (mailing notice to last known address of class members constitutionally adequate even where one-third of class members were not reached by mailing); *Weinberger v. Kendrick,* 698 F.2d 61, 71 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (rejecting appellants' contention that the mailing of individual notice to the last known addresses of all class members was inadequate); *Trist,* 89 F.R.D. at 3 (approving notice procedure, stating "[t]he failure to send notice to 37 or even 137 must be considered together with the fact that notice was given to 25,000 other similarly situated class members without provoking a single objection").

While "[a]dequacy of notice to the class as a whole determines the binding effect of a class settlement on an individual class member," *In re VMS Sec. Litig.,* No. 89 C 9448, 1992 WL 203832 at *5 (N.D.Ill. Aug. 13, 1992), a Court retains the power to allow claimants to file late opt-out requests pursuant to Fed.R.Civ.P. 6(b)(2) [2],

---

**2.** Fed.R.Civ.P. 6(b) provides the method by which a court may in its discretion, for cause shown, enlarge a period of time within which a party is required or allowed to do an act.

60(b)[3] or 23(d)[4]. Courts have usually relied on Rule 6(b)(2) in considering motions for an extension to opt-out of the class, *Georgine v. Amchem Products, Inc.,* No. Civ.A. No. 93–0215, 1995 WL 251402 at *4 (E.D.Pa. April 26, 1995), but the standard for granting relief under all three provisions is generally the same: excusable neglect. *See Supermarkets General Corp. v. Grinnell Corp.,* 490 F.2d 1183, 1186 (2d Cir.1974) ("The same consideration requires rejection of Supermarkets' argument that its time to opt-out should have been extended under Fed.R.Civ.P. 6(b)(2) or 60(b)(1), or in the court's general discretion under Rule 23 itself. We assume that Rule 6(b)(2) and 60(b)(1) cover excusable neglect by a party, or by its attorneys, or by both, and we also agree with appellant that the relevant standards are no different if the matter is viewed as arising simply under the court's discretion to implement Rule 23"); *In re Del–Val Financial Corp. Sec. Litig.,* 154 F.R.D. 95, 96 (S.D.N.Y.1994) ("In requesting to be excluded from the class after the November 2, 1993 opt-out deadline, Ms. Heath is essentially requesting an enlargement of time to opt-out under Fed.R.Civ.P. 6(b)(2)").[5] A moving party must show both good faith and a reasonable basis for not acting within the specified period. *Id.* Even upon a finding of excusable neglect, it remains within the district court's sole discretion whether or not to grant the extension. *Georgine,* 1995 WL 251402 at *4. Factors to be considered in making this decision include: the interests of the movants, the interest of the defendants, and the impact of granting the requested extensions on the Settlement itself. *Id.*

The few movants that have beseeched the Court's relief present a plethora of reasons why their actions constitute the "excusable neglect" that should afford them the opportunity to opt-out after the deadline. These petitions can generally be classified as falling into the following categories: movants claiming that they did not receive the Class Notice because it was mailed to an old address; movants who were involved in litigations with PSI during the time of the Settlement proceedings, and claim that PSI is now estopped from seeking to terminate such litigation with them because of PSI's failure to inform them (or their litigation counsel) of the pendency of the Class Action within those individual proceedings; movants who may or may not have received the Notice, but contend that PSI would not be prejudiced by allowing them to opt-out late because PSI was aware of their intention to continue pursuit of their individual actions against PSI; and movants who received the Notice, but did not opt-out because they did not believe that the Settlement covered their claims. The Court will deal with each of these claims in turn.

### 1. Incorrect Address

■ As indicated above, actual receipt of class notice is not necessary in order to bind an absent class member to a final judgment. Indeed, many of the cases standing for this proposition also indicate that notice by mail sent to the last known address of the absent class member meets the due process requirement of notice through "reasonable effort" even where numerous class members have since changed addresses and do not receive notice. *See, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 71 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (approving of mailing of individual notices to the last known addresses of all class members, because the district court "found this procedure adequate and we see no reason to disturb this finding, particularly since no alternative method of ascertaining class members' identities has been suggested to

---

**3.** Fed.R.Civ.P. 60(b) provides in relevant part that a court can relieve a party from a final judgment if the judgment is "void," or for any other reason "justifying relief."

**4.** Rule 23(d) allows the Court to make appropriate orders to manage a class action.

**5.** Fed.R.Civ.P. 60(b)(6) grants the Court wide discretion to afford relief from a final judgment for

"any reason justifying relief," leading some courts to analyze motions for an extension to opt out of a class brought under this provision separately from those brought under Fed.R.Civ.P. 6(b). *See, e.g., In re VMS Limited Partnership sec. Litig.,* 1995 WL 355722 (N.D.Ill. June 12, 1995). Even under Rule 60(b)(6), however, a court will not grant relief absent "extraordinary circumstances." *Id.* at *2.

us"); *Grunin v. International House of Pancakes*, 513 F.2d 114, 121 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (procedure approved even where one-third of class members were not reached); *Trist v. First Federal Savings & Loan Assoc. of Chester*, 89 F.R.D. 1, 3 (E.D.Pa.1980). This standard has been upheld even in cases where the class member had notified the defendant of a change in address. *In re VMS Limited Partnership Sec. Litig.*, No. 90 C 2412, 1995 WL 355722 at *2 (N.D.Ill. June 12, 1995).[6]

In providing the Class Claims Administrator with the addresses to which the direct mail Notice was sent, PSI used the address which appeared in a data base maintained by PSI of all purchasers of PSI's Direct Investment Group Partnerships. This data base, which was utilized by PSI in connection with the SEC Claims Fund procedures, was considered by PSI to be the best practicable source for identifying class members for this action. Accordingly, the Court has denied the motions for extension of time based on this ground.

### 2. Estoppel/Lack of Prejudice

A second group of movants who had individual actions pending against PSI at the time of the opt-out period seek exclusion on the ground that they or their litigation counsel were not given individual supplemental notice of the Class Settlement within the confines of their individual proceedings. The crux of their argument is that PSI's failure to give them such notice now estops PSI from seeking to have that litigation or arbitration dismissed.

It is well-established that "pendency of an individual action does not excuse a class member from filing a valid request for exclusion." *Berman v. L.A. Gear, Inc.*, No. 91 Civ. 2653, 1993 WL 437733 at *5 n. 1 (S.D.N.Y. Oct. 26, 1993), *aff'd.*, 29 F.3d 621 (2d Cir.1994); *Supermarkets Gen. Corp. v. Grinnell Corp.*, 59 F.R.D. 512, 513 (S.D.N.Y. 1973), *aff'd.*, 490 F.2d 1183 (2d Cir.1974) (individuals not excluded from class by mere fact of having filed an independent action). Since initiation of separate litigation did not confer upon these Class Members a right to notice above and beyond that due other Class Members, the motions brought on this ground must fail.[7]

A similar argument made by some of the movants who had been engaged in separate litigation or arbitration with PSI at the time of the Settlement Proceedings is that PSI would not be prejudiced by allowing these movants to opt-out late because their individual proceedings put PSI on notice of their intention to continue pursuit of their claims. As indicated above, this argument is wholly without merit. In making its decision whether or not to waive the "blow" provision, PSI considered the quantity and quality of the exclusion requests *timely* received and regarded all other pending litigations and arbitrations as encompassed within the $110,000,000 Settlement. Thus, in making its Settlement offer, PSI bargained for the precise finality that these movants now seek to undermine. The motions brought on this ground must fail as well.

### 3. Settlement Scope

A final group of movants did not contend that they failed to receive notice, but rather claimed that they did not return their

---

6. This procedure was upheld in *Grunin, supra,* even without further notice by publication, a precautionary measure that was taken here.

7. While actual receipt of notice is not required to make the Settlement binding on absent class members, *see* discussion *supra,* it is worthy of note that several of the movants engaged in litigation with PSI at the time of the opt-out period were represented by counsel who was simultaneously representing other Class Members who *did* receive the Notice. Notice conferred upon a class member's counsel may be imputed to the class member herself. *See, e.g., Langford v. Dev-*

*itt,* 127 F.R.D. 41, 44–45 (S.D.N.Y.1989) ("The only conclusion to be drawn from these representations is that John T. Murray [movant's counsel] received actual notice of the class certification in the case at bar. John T. Murray, unlike a layman, was then in a position to understand the significance and potential effects of the class action, the means available to review the details of the class action, and the legal options regarding participation in the class action. He was also in a position to understand the significance of not having received formal notice and how to correct that problem").

opt-out forms in a timely manner because they were not aware that the claims they had brought (or would bring) against PSI were covered by the Settlement. The Settlement Agreement defined "Settled Claims" as:

> any and all claims ... or causes of action, whether based on federal, state, local, statutory or common law or any other law, rule or regulation ... that have been asserted in any forum by the Class Members ... against any of the Released Parties ... which relate in any way to the marketing, purchase, sale or holding of Units or other interests in, or to the operation, oversight, monitoring or management of, any of the Partnerships during the Class Period.

The claims brought under this theory involved current and former employees of PSI who made investments in the limited Partnerships, but seek to recover against PSI for the harm to their business reputation that they incurred through sale of the Partnerships and for other related injury arising out of their sale of these investments, which they sometime denominate by "employment claims." Because the Class consisted of all purchasers of the designated Partnerships within the defined period, those present and former employees who did not invest in the Partnerships are not barred by the Settlement from pursuing such claims, while those who did make investments are. Movants asserted that this preclusion was not made clear by the terms of the Settlement Notice, and that even if clear, the Settlement Release casts too broad a scope and should be redefined.

As to the Notice's clarity, the Notice specifically advised Class Members with claims pending against PSI to "consult with the attorney representing you, as this Consolidated Action, the certification of the Class, the proposed partial Settlement and this Notice may affect your claim or your action. The Notice immediately thereafter also stated in bold letters: "THE RELEASE TO BE GIVEN TO THE PSI SETTLING DEFENDANTS AND THE RELEASED PARTIES IS VERY BROAD AND MAY IMPACT UPON OTHER RIGHTS OR CAUSES OF ACTION YOU HAVE." This same admoni-

tion was repeated, again in bold letters, at paragraph 10 of the Notice. Thus, regardless of whether or not a given Class Member believed his claim to be covered by the Settlement, he was at least on notice that he should make a further inquiry. Numerous similarly-situated brokers and their counsel who read the Class Notice did file timely opt-outs.

As to the broadness of the Release's scope, the Court need not address the merits of such a claim. The Notice informed all recipients of the ability to voice any objections they might have to the Settlement at the Fairness Hearing held on November 17, 1995. None of the movants who seek leave to opt-out late were present at such hearing or filed a timely objection and their allegations of the scope concerning the Release are presented to the Court too late.

In support of their various petitions, movants presented a number of cases in which motions for leave to file a late exclusion form were granted. See, e.g., In re Del–Val Financial Corp. Sec. Litig., 154 F.R.D. 95 (S.D.N.Y.1994); Mars Steel Corp. v. Continental Illinois National Bank and Trust Co. of Chicago, 120 F.R.D. 51 (N.D.Ill.1988). None of these cases, however, involved the type of "blow" provision involved here and, in contrast to the severe prejudice that PSI would incur were the relief sought here granted, most of the courts granting such leave specifically noted that neither party would be prejudiced by the granting of the motion. See In re Del–Val, 154 F.R.D. at 96–97 ("Our holding is supported by the fact that I/JL is not one of the Settling Defendants and hence will not be prejudiced if Ms. Heath opts-out of the class at this time"); Mars Steel Corp., 120 F.R.D. at 53 ("Finally, we note that Continental does not contradict movants' position that Continental will not be prejudiced by this enlargement of time").

Finally, the Court has considered the potential impact that a grant of the relief sought would have on this Settlement. In this regard the Court notes that granting leave to file untimely exclusions "would undermine the finality of judgments entered therein and would discourage settlement of such actions. Defendants would be loath to

offer substantial sums of money in compromise settlements of class actions unless they can rely on the notice provisions of Rule 23 to bind class members." *In re VMS Limited Partnership Sec. Litig.*, No. 90 C 2412, 1995 WL 355722 at *2 (N.D.Ill. June 12, 1995) (citations omitted).

The Court having considered the interest of all parties, and the potential impact that a grant of leave would have on the Settlement itself, accordingly finds that movants' motions for a grant of leave to file late exclusions are and should be denied.

SO ORDERED