**PRESIDENTIAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**Michael R. MILKEN, et al., Defendants.**

No. 92 Civ. 1151 (MP).

United States District Court, S.D. New York.

Nov. 4, 1996.

---

Law Offices of Thomas P. Puccio, New York City by Thomas P. Puccio and Seidler & McErlean, Chicago, IL by John F. Verhey, for TLC Beatrice.

Wolf, Popper, Ross, Wolf & Jones, New York City by Stanley Nemser and Jeffrey K. Konis Class Counsel.

Berger & Montague, Philadelphia, PA by David Berger, Lawrence J. Lederer and Michael L. Block, Class Counsel.

Weil Gotshal & Manges, New York City by Richard J. Davis, for DP Investments & Special Counsel to Presidential Life.

Donovan, Leisure Newton & Irvine, New York City by James Stengel and Sidley & Austin, Los Angeles, CA by Theodore N. Miller, for Carlton Investments.

## DECISION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILTON POLLACK, Senior District Judge.

### Preliminary

A final judgment was entered in this settlement class action by this Court on July 17, 1992, approving a settlement. On July 27, 1995, a member of said class, TLC Beatrice International Holdings, Inc. ("Beatrice"), sought intervention in said suit as of right under Rule 24(a). Fed.R.Civ.P., and for relief under Rule 60(b) from said final judg-

ment. This Court denied the motion to intervene outright, without opinion, and denied the motion under Rule 60(b) as moot. On appeal from said denials, the Court of Appeals found that the district court was in error with regard to mootness, and believing that the appellate court would benefit from the views of the district court on the merits of the motions, remanded the judgment to the district court on the issues of the timeliness of the motion to intervene and the adequacy of notice to Beatrice of the class action. The appellate court further expressed hesitancy to address the important issue of so-called settlement class action without knowing the views of the district court, which was deeply involved in both the Milken Global Settlement and the bringing and settlement of the Global Class Action (the instant suit). The remand stipulated that "to the extent practicable, any subsequent appeal should be referred to [the same panel]."

After hearing argument of counsel, the Court announced its decision to deny the motions and sets forth herein its Findings of Fact and Conclusions of Law in connection with said decision on the matters involved.

### FINDINGS OF FACT

#### Presidential Life

1. On July 27, 1995, TLC Beatrice International Holdings, Inc. ("TLC") moved to intervene and for relief from the Judgment in this action ("*Presidential Life*") pursuant to Federal Rules of Civil Procedure 24 and 60(b) (the "Intervention Motion" and the "Rule 60(b) Motion," respectively).

2. *Presidential Life* was a securities class action certified pursuant to Federal Rule of Civil Procedure 23(b)(3). The representative plaintiff in that suit alleged in its Class Action Complaint dated February 14, 1992, and subsequently in its Amended Class Action Complaint dated July 9, 1992 (the "Complaint") that hundreds of individual and partnership defendants (including Carlton), all of whom were related to The Drexel Burnham Lambert Group, Inc. and/or its subsidiaries ("Drexel"), had conspired to violate, *inter alia*, various provisions of the federal securities and antitrust laws and had manipulated

the prices of securities in the market for high yield bonds. The representative plaintiff also alleged that as a result of transactions involving securities underwritten, marketed, distributed or sold by Drexel, it and other similarly situated individuals and entities were damaged as a result of the defendants' alleged wrongdoing. The Court had subject matter jurisdiction over the claims asserted therein.

3. This Court certified a class of plaintiffs in *Presidential Life* "consisting of all persons acting in their own capacity, derivatively, or in a representative capacity, directly or indirectly, having actual or potential claims of whatever kind or nature, which have not previously been asserted against any of the Settling Defendants prior to February 4, 1992, arising out of activities from January 1, 1978 through December 31, 1991 (the 'Global Class Period') relating to" certain aspects of Drexel's business. Order and Final Judgment of Dismissal of Global Class Action, Including Permanent Injunctions, dated July 17, 1992, ¶ 3. TLC is a member of the *Presidential Life* class.

## Background

4. *Presidential Life* was an important link in a series of settlements which provided very material benefits to Drexel's bankruptcy estate and its plan of reorganization.

5. The first related settlement was the Securities Litigation Claims Settlement Agreement of May 3, 1991 (the "Claims Agreement") which resolved the billions of dollars of claims filed by securities litigation claimants in Drexel's bankruptcy proceedings, captioned *In re The Drexel Burnham Lambert Group Inc., et al.,* Case No. 90 Civ. 6954 (MP), Chapter 11 Case No. 90–B–10421 (FGC). Absent the Claims Agreement, it is likely that there would have been a Chapter 7 liquidation to the detriment of all of Drexel's creditors. The Claims Agreement was incorporated in, and enabled Drexel to reorganize and emerge from bankruptcy pursuant to, the Drexel Second Amended Joint Plan of Reorganization, dated March 5, 1992 (the "plan of reorganization").

6. The Claims Agreement and the related plan of reorganization, among other things, contemplated:

a. That the claims of Drexel and the claims of certain of the securities litigants would be pooled together (the "Pooled Claims"), that control of the Pooled Claims would be vested in the participating securities litigants (the "Pool Administrators") and that the non-securities litigant creditors of Drexel would receive 14% of any recoveries on the Pooled Claims; and

b. That any individual or entity settling with the Pool Administrators prior to the confirmation of the Drexel plan of reorganization would receive the benefit of certain injunctions and releases if the District Court found that the settlement "provided a material benefit to the Debtors' estates and to consummation of the Plan." Such individuals or entities were defined in the Drexel plan of reorganization as Identified Settling Parties.

7. Prior to the filing of *Presidential Life,* over 180 civil actions had been brought against some or all of Drexel, Michael Milken and the hundreds of other *Presidential Life* defendants concerning purportedly improper conduct, undertaken primarily in the 1980's, related to Drexel's operations ("Drexel-related conduct" and "Drexel-related claims").[1]

8. One such action that was instituted pursuant to the pooling arrangements was a civil suit brought by Drexel against Michael Milken and other defendants, *Drexel Burnham Lambert, Inc. v. Milken, et al.,* 91 Civ. 6108 (MP) (S.D.N.Y.). The filing of this action, in particular, was a catalyst for the settlements that would follow.

9. After extensive and extremely hard-fought negotiations in which all interested parties were represented, the parties to the civil actions executed a stipulation of settlement dated as of March 9, 1992, setting forth the terms of a proposed comprehensive settlement resolving claims against each of the

1. The Complaint in one such action, *FDIC v. Milken, et al.,* Civ. No. 91–0433 (MP), is a representative example of the claims in such actions. The allegations therein closely parallel those of the *Presidential Life* Complaint.

hundreds of Settling Defendants [2] (the "Milken Global Settlement"). The Milken Global Settlement provided for a $1.3 billion settlement fund, with $1.2 billion to be paid over time by the Settling Defendants and an additional $100 million to be paid in connection with various insurance settlements. The Milken Global Settlement also provided for a $50 million indemnity fund to address any Drexel-related liabilities of the Settling Defendants that would survive the Milken Global Settlement (the "Indemnity Fund"). After notice of the proposed settlement was provided to all of the claimants in Drexel's bankruptcy, this Court entered an order on March 9, 1992 approving the Milken Global Settlement.

10. There were a number of conditions to the effectiveness of the Milken Global Settlement. One such condition was that this Court's order approving the settlement of *Presidential Life*—an action brought on behalf of those persons who had Drexel-related claims against the Settling Defendants that had not been asserted previously in any existing action—had to become final. A second condition was that the Milken Global Settlement afforded the Settling Defendants an unqualified right to terminate the Milken Global Settlement if they determined in good faith that the value of the claims against them that would survive the Milken Global Settlement—*i.e.*, the *Presidential Life* opt outs' claims—posed an unacceptable financial risk given the $50 million allocated to the Indemnity Fund (the "Termination Provision").

11. The Milken Global Settlement refers specifically to: (1) the existence of *Presidential Life*; (2) the Settling Defendants' desire to resolve all unasserted claims against them arising out of Drexel-related conduct; and (3) the *Presidential Life* class members' right to opt out of the settlement.

12. The Milken Global Settlement ultimately became effective on September 29, 1993. Prior to its becoming effective, class counsel, counsel to the Settling Defendants and counsel to Drexel, sometimes with the Court's assistance, communicated with the *Presidential Life* opt outs in an attempt to resolve their claims. After the conclusion of this process, the defendants waived their rights under the Termination Provision.

13. The Court found that the Milken Global Settlement provided a material benefit to Drexel's estate, facilitating Drexel's reorganization, and, therefore, that the Settling Defendants qualified as Identified Settling Parties under Drexel's plan of reorganization, because:

a. Pursuant to the pooling arrangement in the plan of reorganization, Drexel's Fixed Creditors received more than $84 million (less certain expenses which under the terms of the plan of reorganization were to be deducted);

b. More than $600 million in claims filed against Drexel were released;

c. Potentially significant contribution and indemnity claims filed against Drexel were released;

d. Claims against settling partnerships—including Carlton—in which Drexel had an interest were released, which removed a significant obstacle to Drexel realizing on its interest in those partnerships, which had a value of well over $200 million;

e. Implementation of the Employee ERISA Compensation Claims settlement, which was an integral part of the plan of reorganization, was facilitated by the release by Michael and Lowell Milken of their Class 6 Claims under the plan of reorganization; and

f. By settling Drexel litigations involving bonuses, partnership investments by former employees and claims against Michael Milken, significant time-consuming burdens were removed from employees of

---

2. The term Settling Defendants is defined in the Stipulation of Settlement in *Presidential Life*, dated March 11, 1992, and includes each of the defendants named therein. These same individuals and entities constitute the "Settling Participants" as that term is defined in the Milken Global Settlement. They were also, ultimately, made "Identified Settling Parties" in Drexel's bankruptcy, and thereby were released from Drexel-related liability. For purposes of consistency, the term Settling Defendants is used herein to refer to this group of individuals and entities.

the Trust that was created under Drexel's plan of reorganization.

### The Presidential Life Settlement

14. When the *Presidential Life* complaint was filed, it was anticipated that that action would be settled.

15. The parties to *Presidential Life* entered into a stipulation of settlement dated March 11, 1992 (the "*Presidential Life* Stipulation") to resolve the claims therein. The *Presidential Life* Stipulation provided for a $50 million recovery for the plaintiff class.

16. Class counsel supervised a notice program of unprecedented extent in *Presidential Life* that fully complied with and exceeded all applicable requirements of Rule 23(c)(2) and due process. As this Court found previously, the notice of the proposed settlement afforded to class members was fully adequate to apprise them of their rights in connection therewith, as demonstrated by:

· The mailing of more than 42,000 notices to identifiable class members, based on Drexel's transactional records; and

· The publication of a detailed notice in 201 publications, including 153 domestic publications and 48 foreign publications, on two separate occasions.

17. Over 4,000 notices were mailed to individuals and entities that requested individual notices after learning of the settlement through the notice program. The effectiveness of the notice program is further illustrated by the 4,778 proofs of claim that were ultimately filed.

18. Given that the allegations in the *Presidential Life* Complaint focused exclusively on Drexel-related conduct and the large number of notices being mailed, it was appropriate and reasonable to use the addresses contained in Drexel's transactional records. Given the volume of notices being mailed, it was not feasible to attempt to re-verify whether any particular one of the over 40,000 addresses had been changed, or otherwise to obtain address information, by canvassing the hundreds of defendants for such informa-tion as to each of the intended recipients of the notice.

19. The period during which class members could opt out expired on June 24, 1992. Nearly two hundred class members opted out from the *Presidential Life* settlement. TLC did not opt out.

20. This Court conducted a fairness hearing on July 14, 1992. At that hearing, the Court addressed objections raising certain of the same issues raised by TLC here, including objections relating to the reasonableness of the size of the *Presidential Life* settlement fund in relation to the Settling Defendants' assets [3] and class counsel's ability to represent adequately both the *Presidential Life* class and its clients with Drexel-related claims being resolved in other litigations. TLC did not appear at that hearing or otherwise raise any objection to the settlement at that time.

21. On July 17, 1992, this Court entered its Order and Final Judgment of Dismissal of Global Class Action, Including Permanent Injunctions (the "*Presidential Life* Judgment") approving the settlement set forth in the *Presidential Life* Stipulation as fair, reasonable, and adequate. In addition to entering the Judgment, this Court made Findings of Facts and Conclusions of Law regarding the settlement, also dated July 17, 1992 (the "July 1992 Findings and Conclusions"). The July 1992 Findings and Conclusions are incorporated herein.

22. In the July 1992 Findings and Conclusions, this Court determined that certification of the *Presidential Life* class (sometimes referred to as the "Global Class") was appropriate because the class satisfied each element of Federal Rule of Civil Procedure 23(a), including the Rule's requirements of adequate representation and typicality, as well as those of Federal Rule of Civil Procedure 23(b)(3).

23. With regard to Rule 23's notice requirement, this Court concluded at the time that: "The Global Class Notice given to the Global Class fully, accurately and adequately

---

**3.** The Court had access to and reviewed financial information relating not only to Michael Milken, but as to each of the individual Settling Defen-dants pursuant to Part X of the Milken Global Settlement and Annex H thereto.

informed all members of the Global Class of all material elements of the Global Class Action, the Class Settlement and the Milken Global Settlement, and constituted valid, due and sufficient notice to all members of the Global Class in all respects, complying fully with Rule 23 of the Federal Rules of Civil Procedure and due process." Judgment, ¶ 6. That conclusion was based on detailed findings of fact. *See* July 1992 Findings and Conclusions, ¶¶ 33–34, 66.

24. The Court carefully scrutinized the *Presidential Life* settlement, and was fully aware of its terms as well as the claims and defenses that the parties could have asserted.

### Circumstances Giving Rise to the Instant Motions

25. TLC initially brought the instant motions for leave to intervene, pursuant to Federal Rule of Civil Procedure 24, and for relief from the Judgment, pursuant to Federal Rule of Civil Procedure 60(b), in response to Carlton's claim that the assertion by TLC and related persons of certain affirmative defenses, in an action that Carlton had brought against those persons in New York state court, was in contempt of the *Presidential Life* Judgment. TLC also stated for the first time, in its papers supporting the instant motions, its desire to assert against Carlton and two other Settling Defendants, in that state court action, two new counterclaims that are barred by a release and an injunction in the *Presidential Life* Judgment.

26. On May 20, 1994, Carlton filed a civil action in New York Supreme Court against TLC and certain related individuals and entities (the "New York Action").[4]

27. In the New York Action, Carlton is seeking damages for breach of a stockholders' agreement (the "Agreement") between Carlton and TLC entered into in November of 1987. Carlton has alleged that TLC violated the terms of the Agreement by approving a $22.1 million compensation package for Reginald Lewis, TLC's founder and then-CEO.

28. In response, TLC's original answer asserted a number of affirmative defenses intended to preclude enforcement of the Agreement based upon its contention that Carlton acquired its interest in TLC and its rights under the Agreement in the mid–1980's through extortion, a conspiracy to defraud and breaches of fiduciary duty (the "Affirmative Defenses"). TLC's answer also alleged that Carlton "stripped" equity from it by requiring it to provide Carlton with equity as a condition to Drexel's completion of a high-yield bond offering for TLC. TLC's original answer did not, however, seek any affirmative relief in connection with its alleged "equity stripping" theory.

29. Carlton argued in support of its contempt motion that TLC's assertion of its Affirmative Defenses constituted an attempt to raise a claim that was barred by an injunction in the *Presidential Life* Judgment. That motion was denied by an order dated September 12, 1995.

30. In light of the Court's denial of Carlton's contempt motion, TLC has already received all of the relief that its Intervention and Rule 60(b) Motions seek with respect to the Affirmative Defenses. Accordingly, the Affirmative Defenses are no longer at issue here.

31. TLC also proposed in the papers it filed in support of its Intervention and Rule 60(b) Motions to assert two new counterclaims against Carlton premised on the same alleged equity stripping that serves as the basis for the Affirmative Defenses included in its original answer. TLC's proposed counterclaims seek rescission of the sale of the TLC stock which Carlton acquired and the imposition of a constructive trust on that stock. TLC concedes that assertion of its proposed counterclaims would violate the release and injunction in the *Presidential Life* Judgment, which precludes class members

---

4. The New York Action, *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, Index No. 114798/94, is pending before Justice Beatrice Shainswit in New York County. Carlton has brought a separate, derivative action alleging that Reginald Lewis, TLC's deceased founder, looted well in excess of $50 million from TLC. That action, *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, C.A. No. 13950, is pending before Chancellor William T. Allen in Delaware's Court of Chancery.

from relitigating the claims adjudicated therein, and it is purportedly for the purpose of being permitted to bring the two proposed counterclaims that TLC continues to pursue the instant motions. TLC never sought to assert the counterclaims it describes in its motions, nor did it seek permission from this Court to do so, until after Carlton sought to hold it in contempt.

32. TLC had knowledge of the facts giving rise to its new proposed counterclaims against Carlton at least as early as the time of the Milken Global Settlement. Since no later than November of 1987, TLC has been aware that Carlton obtained a substantial percentage of TLC's stock, and of the circumstances under which that acquisition took place.

33. TLC, despite its knowledge of the Milken Global Settlement and the *Presidential Life* settlement, did not opt out of the *Presidential Life* class. TLC also did not object to the *Presidential Life* settlement, and at no time indicated, prior to the assertion of its Affirmative Defenses in the New York Action on December 2, 1994, or the making of the instant motions on July 27, 1995, that it believed that it had Drexel-related claims against Carlton or any other Settling Defendant, or that it intended to pursue such claims.

### TLC's Notice of Presidential Life

34. TLC and its counsel were fully aware of the *Presidential Life* settlement and its rights therein at the time of the settlement.[5]

35. First, among the more than 200 publications in which notice of the settlement appeared, were *The New York Times* and *Wall Street Journal*—Global Edition. The Court finds that it may presume that TLC Beatrice, Mr. Reginald Lewis, the CEO of Beatrice, W. Kevin Wright, Esquire, Beatrice's ex-general counsel or one of Beatrice's other responsible officers or directors, from the nature of their occupations and positions in the business world and their relationships

with Drexel officials as that appeared to the Court during the pendency of the Drexel bankruptcy and its related proceedings, that each had called to their attention, or read one or more of the many publications on the dates that the notices were published.

36. Second, numerous copies of the Notice of Pendency of Class Action, of Proposed Settlement and of Settlement Hearing were mailed to TLC and related entities. Four of the notices were mailed to an address at 99 Wall Street, New York, New York—an address that TLC had occupied, but then moved from, prior to the initiation of the *Presidential Life* notice program. This was the address for TLC that was contained in the Agreement that is the subject of the New York Action.[6]

37. Four additional notices were mailed to the address of TLC's predecessor entity, the Beatrice Companies, at 2 North LaSalle Street, Chicago, Illinois. Additional notices were mailed to three financial institutions that apparently were Beatrice-related bank fiduciaries.

38. Not all of the notices mailed to 99 Wall Street, and none of the four notices that were mailed to the Beatrice Companies' address in Chicago, one of which was addressed to Mr. William Mowry, President, TLC Beatrice International Holdings, were returned as undeliverable. The notices mailed to the bank fiduciaries also were not returned. Among the unreturned notices was one addressed to Reginald Lewis, TLC's then-CEO, at 99 Wall Street. The Court finds that it is reasonable to conclude that the unreturned notices were received.

39. Third, TLC retained the law firm of Battle Fowler prior to the expiration of the *Presidential Life* opt out period to advise TLC as to its potential claims against Carlton. Carl A. de Brito of Battle Fowler, acting in his capacity as counsel to TLC, sent a letter dated May 4, 1992 to Peter G. Smith of Donovan Leisure Newton & Irvine, coun-

---

5. Not only did TLC have contemporaneous notice of the *Presidential Life* settlement, but TLC admits that it had actual notice of the *Presidential Life* settlement at some time between May 1994 and October 1994.

6. The Agreement states that the required notice address for TLC is 99 Wall Street, New York, New York. TLC has never amended that notice provision for purposes of said agreement.

sel to Carlton, and listing W. Kevin Wright, TLC's then General Counsel, as an intended recipient. In his May 4 letter, Mr. de Brito raised various questions relating to Carlton's request for TLC's consent to Carlton's pledge of its TLC stock in connection with the Milken Global Settlement.[7] The letter demonstrates that Mr. de Brito both received and had a detailed understanding of the terms and conditions of the Milken Global Settlement, and was therefore fully apprised of: (1) the existence of *Presidential Life;* (2) the intention of the parties thereto to resolve all as yet unfiled claims against the defendants alleging Drexel-related misconduct; (3) class members' right to opt out of *Presidential Life;* and (4) the Settling Defendants' rights under the Termination Provision.

40. The first paragraph of the Milken Global Settlement recites that the parties "desire to settle all actions identified on Schedule 3, including *Presidential Life Insurance Company v. Michael Milken, et al.,* 92 Civ. 1151–MP (S.D.N.Y.) (the 'Global Class Action'), that have been commenced against one or more of the Settling Participants ..." Milken Global Settlement at 1.

The text on the first and second pages continues:

> [T]he Global Class Action includes Drexel Related Claims against the Settling Participants, not the subject of lawsuits prior to February 4, 1992, and includes all lawsuits filed between that date and the date the class in the Global Class Action is certified....
>
> ....
>
> ... [T]he parties are seeking to satisfy and resolve all Drexel Related Claims that

have been or could be asserted by anyone against the Settling Participants....

*Id.* at 1–2. Similarly, the Milken Global Settlement provides as a condition precedent to its effectiveness:

> The District Court must have issued an order approving the settlement of the Global Class Action, which order shall also enjoin any member of the Global Class *who does not opt out* from commencing any action in any court alleging any Drexel Related Claims against any Settling Participant....

*Id.* at 33 (emphasis added).

41. Mr. de Brito transmitted his May 4 letter to Mr. Smith more than a month prior to the expiration of the *Presidential Life* opt out period. Thus, the counsel which TLC retained to consider TLC's potential claims against Carlton was apprised, no later than May of 1992, of the *Presidential Life* settlement and TLC's rights with respect thereto.

42. The clear statement in the Milken Global Settlement of the identity of *Presidential Life* and its intended purpose was more than adequate to communicate to TLC, through its counsel, the existence and effect of *Presidential Life.* This finding is particularly appropriate given the status of TLC and its counsel as sophisticated business entities and TLC's familiarity with Drexel and Drexel's business.[8]

*Carlton, the Other Settling Defendants and the Plaintiff Class Have Relied to Their Detriment on TLC's Failure Either to Object or to Opt Out Earlier*

43. The Court finds that it was the expectation of the Settling Defendants that the

---

7. The terms of the Milken Global Settlement required certain of the Settling Defendants, including Carlton, to make a pledge of cash and/or securities to ensure their satisfaction of their financial obligations under that agreement.

8. In addition, Carlton has submitted an affidavit prepared by Richard V. Sandler, counsel to Michael Milken in *Presidential Life.* In his affidavit, Mr. Sandler states that he had a conversation with Reginald Lewis, founder and then-CEO of TLC, in the Spring of 1992 in which Mr. Sandler and Mr. Lewis discussed the Milken Global Settlement. Mr. Sandler states that during this conversation, which took place prior to the expira-

tion of the *Presidential Life* opt out period on June 24, 1992, Mr. Lewis expressed his understanding that the Settlement would resolve all Drexel-related claims against Michael Milken and related individuals and entities, as well as his detailed knowledge of the scope, structure and effect of the Milken Global Settlement. While the Court does not rely on Mr. Sandler's affidavits in reaching its conclusions herein, the affidavit is fully consistent with and reinforces the evidence of TLC's actual knowledge of the *Presidential Life* settlement and its rights with regard thereto.

Milken Global Settlement would have the effect of providing a total and final resolution of all Drexel-related claims against them, except as to known opt outs from *Presidential Life* or those plaintiffs in other existing actions who chose not to participate in the Milken Global Settlement. To avoid the existence of any risk from any of these known unresolved claims, the Settling Defendants bargained for the Termination Provision as part of their attempt to obtain peace through the Milken Global Settlement, at the cost of $1.2 billion. The Termination Provision afforded the Settling Defendants an unqualified right to terminate the Milken Global Settlement in the event that they formulated a reasonable belief that unresolved claims, which posed a financial risk that was not addressed adequately by the $50 million Indemnity Fund, would remain. The existence of the Termination Provision caused class counsel, Drexel's counsel, the Settling Defendants' counsel, and counsel to certain other parties to the Milken Global Settlement to seek to resolve all of the *Presidential Life* opt out claims.

44. In the period between March 9, 1992 and the date when the Milken Global Settlement became effective on September 29, 1993, class counsel and the Settling Defendants devoted substantial time and intense effort to assessing the claims that would survive the Milken Global Settlement and the settlement of *Presidential Life*, primarily by identifying, cataloguing and analyzing the opt outs from the *Presidential Life* settlement. Class counsel and the Settling Defendants resolved those claims by negotiations and discussions between counsel for the opt outs and the parties to the Milken Global Settlement.

45. After determining, on the basis of information then available, that their remaining opt out-related exposure posed an acceptable financial risk, the Settling Defendants elected not to exercise their rights under the Termination Provision, and the Milken Global Settlement became effective on September 29, 1993.

46. The Settling Defendants would not have waived their right to terminate the Milken Global Settlement absent satisfactory resolution of the *Presidential Life* opt out claims. Specifically, in view of the putative magnitude of the claim that TLC now seeks to assert—a claim that, standing alone, may allegedly exceed the value of the entire Indemnity Fund—the Settling Defendants likely would not, had they been aware of that claim, have allowed the Milken Global Settlement to become effective without satisfactory resolution of TLC's claim.

47. The effectuation of the Milken Global Settlement consumed a substantial amount of this Court's attention and effort over a period of almost eighteen months. Michael Milken and the other Settling Defendants paid millions of dollars in legal fees and expenses related to the Milken Global Settlement.

48. Class plaintiffs also incurred very substantial costs, fees and expenses in, among other things, reviewing and evaluating the 4,778 proofs of claim which were filed by class members.

49. Administrative processes to distribute funds from the *Presidential Life* settlement were established at substantial time and expense on the part of Class Counsel, the Court and an executive committee, including a representative of the Securities and Exchange Commission ("SEC"), formed by the Court to administer the allocation process (the "Executive Committee"). In the process of reviewing and evaluating the *Presidential Life* claims, the Executive Committee, among other things: (1) developed, approved and implemented guidelines for purposes of evaluating the claims; (2) reviewed voluminous documentation of the claims; (3) engaged in extensive negotiations with claimants; (4) evaluated the claims that were determined to be eligible for purposes of distribution; and (5) prepared the requisite papers and secured this Court's approval of the Executive Committee's treatment of all of the filed claims.

50. The Court held a hearing on June 26, 1996 to consider the application brought by the Executive Committee for approval of the evaluations. Two objectors appeared at that hearing.

51. By an Order dated July 8, 1996, the Court approved the evaluations arrived at by

the Executive Committee. That order is now final. The two claims submitted by Presidential Life Insurance Company and a related entity were evaluated in an amount in excess of $23.7 million.[9]

### TLC's Motions

52. The Rule 60(b) motion was not made within the obligatory "reasonable time." No exceptional circumstances exist that would justify the relief sought by TLC in its Rule 60(b) Motion.

53. TLC failed to act to protect its purported interests for years despite its knowledge of the *Presidential Life* settlement and its rights with respect thereto prior to the expiration of the opt out period. The Settling Defendants, including Carlton, as well as the plaintiff class, relied to their detriment on TLC's failure to opt out or to object earlier. It is too late for intervention, substantial equities have intervened which cannot be unwound and which it is unfair to disturb or prejudice. Beatrice is and conscionably should be estopped from challenging any aspect of *Presidential Life.*

54. If this Court were to grant the instant motions, the result would severely prejudice the existing parties. This prejudice would include a massive potential litigation risk to the *Presidential Life* defendants in addition to, at the very least, a delay of the distribution of the *Presidential Life* settlement proceeds and increased legal costs to the other class members.

55. TLC has not identified any interest that it holds which has not been represented adequately by the representative plaintiff and its counsel. It is noteworthy in this regard that other class members with equity

stripping claims similar to those of TLC participated actively in *Presidential Life.*

56. The foregoing shall constitute this Court's findings of fact.

### CONCLUSIONS OF LAW

#### TLC's Rule 60(b) Motion

■ 57. TLC's Rule 60(b) Motion is denied. Rule 60(b) contains the explicit command that "The motion shall be made within a reasonable time"; it was not made within the prescribed "reasonable time." It is the law of this circuit that relief is available under Rules 60(b)(4) and 60(b)(6) only upon a showing of "exceptional circumstances." [10] TLC has failed to demonstrate that such circumstances exist here.

■ 58. The Court concludes that because the notice program in *Presidential Life* met and exceeded all requirements of Federal Rule of Civil Procedure 23(c)(2) and due process, TLC is bound by the Judgment, and its request for relief from the Judgment is inadequate as a matter of law. The sufficiency of the notice program is illustrated by the over 200 publications in which the notice was published on two occasions and the more than 42,000 notices mailed to prospective class members, as well as by the nearly two hundred opt outs, the 4,778 proofs of claim that were ultimately filed in this matter and the over 4,000 notices that were mailed to individuals and entities who requested individual notices after learning of the settlement through the notice program.

59. A class action settlement is binding on an absent class member if the notice program is procedurally adequate, even if the absent class member does not receive individual notice.[11] TLC does not challenge the

---

9. Cash distributions pursuant to the evaluations are subject to a *pro rata* reduction.

10. *Nemaizer v. Baker,* 793 F.2d 58, 61 (2d Cir. 1986). While some courts have, in evaluating motions brought pursuant to Rule 60(b), adopted an analysis similar to that used on motions to dismiss a complaint—*i.e.,* taking all facts asserted by the movant as true—such an analysis is appropriate only "where no evidence or response is offered in opposition" to the motion. *Ervin v. Wilkinson,* 701 F.2d 59, 61 (7th Cir.1983). The Court does not apply such a standard here be-

cause voluminous affidavits and exhibits thereto have been submitted by parties both in favor of and opposed to the instant motions.

11. *See, e.g., Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir.1982); *see also Supermarkets Gen. Corp. v. Grinnell,* 490 F.2d 1183, 1185–86 (2d Cir. 1974); *Silber v. Mabon,* 18 F.3d 1449, 1454 (9th Cir.1994); *Zimmer Paper Prods., Inc. v. Berger & Montague,* 758 F.2d 86, 91–93 (3d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d

adequacy of the content of the Notice of Pendency of Class Action, of Proposed Settlement and of Settlement Hearing or of the published notice employed in *Presidential Life,* but does challenge the adequacy of the procedures employed for distributing the notice. TLC's assertion that the *Presidential Life* notice program was inadequate because the class representatives failed to canvass each of the hundreds of defendants for class members' addresses lacks legal basis.[12] The notice program in *Presidential Life,* which employed Drexel's account records as the source for class members addresses, was procedurally adequate.[13] The use of Drexel's account records for this purpose was particularly appropriate because the *Presidential Life* Complaint focused exclusively on the Settling Defendants' Drexel-related activities.

60. Although the procedural adequacy of the notice program in *Presidential Life* makes it unnecessary to do so for these purposes, this Court concludes further that the record establishes that TLC and its counsel had both actual and constructive notice of the *Presidential Life* settlement and its rights with respect thereto.[14]

61. Rule 60(b) relief is particularly inappropriate where the relevant challenge is brought to a class action settlement.[15] In light of the procedural adequacy of the *Presidential Life* notice program, and especially given TLC's actual and constructive notice of the settlement, the Court finds that the interests of finality outweigh TLC's remaining objections, which include TLC's untimely challenges premised on the Court's purported lack of subject matter jurisdiction, TLC's assertions that the *Presidential Life* settlement was the result of collusion, and TLC's arguments that the class was afforded inadequate representation.[16] Accordingly, the Court denies TLC's Rule 60(b) Motion.

 62. In addition, TLC is estopped from raising its challenges three years after entry of the Judgment.[17] A party to a settle-

227 (1985) (citing cases); *Grunin v. International House of Pancakes,* 513 F.2d 114, 121–22 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 164 F.R.D. 362, 369 (S.D.N.Y. 1996); *Langford v. Devitt,* 127 F.R.D. 41, 44–45 (S.D.N.Y.1989); *In re VMS Ltd. Partnership Sec. Litig.,* No. 90 C. 2412, 1995 WL 355722, at *1 (N.D.Ill. June 12, 1995).

**12.** *VMS,* 1995 WL 355722, at *1 n. 2. Courts have held consistently that notice sent to class members' last known addresses is procedurally adequate. *Weinberger,* 698 F.2d at 71; *Grunin,* 513 F.2d at 121–22; *see also Langford,* 127 F.R.D. at 44–45. These courts have held class members bound to class action settlements even where notice was sent to outdated addresses despite the defendants' possession of updated address information. *See VMS,* 1995 WL 355722, at *2; *see also Supermarkets Gen. Corp.,* 490 F.2d at 1185–86; *Prudential,* 164 F.R.D. at 369–70; *Langford,* 127 F.R.D. at 45 & n. 1.

**13.** *See, e.g., Weinberger,* 698 F.2d at 71.

**14.** The knowledge of TLC's counsel regarding the *Presidential Life* settlement is attributable to TLC. *See, e.g., Prudential,* 164 F.R.D. at 370 n. 7; *Langford,* 127 F.R.D. at 44–45.

**15.** *See Supermarkets Gen. Corp.,* 490 F.2d at 1185–86; *Arthur Andersen & Co. v. Ohio (In re Four Seasons Sec. Laws Litig.),* 502 F.2d 834, 843–44 (10th Cir.), *cert. denied,* 419 U.S. 1034, 95 S.Ct. 516, 42 L.Ed.2d 309 (1974); *Prudential,*

164 F.R.D. at 371–72; *VMS,* 1995 WL 355722, at *2; *O'Brien v. National Property Analysts Partners,* 739 F.Supp. 896, 902–03 (S.D.N.Y.1990); *cf. Astroglass Boat Co. v. Eldridge (In re Astroglass Boat Co.),* 32 B.R. 538, 543–44 (Bankr. M.D.Tenn.1983).

**16.** While TLC premises its Rule 60(b) Motion on two provisions of Rule 60(b), 60(b)(4) and 60(b)(6), it does not even attempt to specify any basis for vacation of the *Presidential Life* Judgment under Rule 60(b)(6), a catch-all provision that applies only where none of the other bases for relief specified in Rule 60(b) is satisfied and the movant can demonstrate "extraordinary circumstances" or "extreme hardship." *See, e.g., United States v. Cirami,* 563 F.2d 26, 32 (2d Cir.1977). Moreover, TLC's assertion of its argument that the settlement was "collusive", *i.e.,* was fraudulent, is impermissible because that argument, which falls within the scope of Rule 60(b)(3), is precluded by the one year limitation that applies to motions under that Rule. Relief under Rule 60(b)(6) is not available where any of subsections (1) through (5) apply. *See Nemaizer,* 793 F.2d at 63; *cf. In re Four Seasons,* 502 F.2d at 841.

**17.** "The vital principle, is, that he who, by his language or conduct, leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted." *Lukens Steel Co. v. American Locomotive Co.,* 197 F.2d 939, 941 (2d Cir.1952); *see also Rosenthal*

ment may be estopped from objecting thereto once another party to the settlement has relied, to its detriment, on the first party's failure to object to the settlement terms.[18] TLC was aware, prior to the expiration of the *Presidential Life* opt out period, of the circumstances surrounding Carlton's acquisition of TLC's stock, of the existence of *Presidential Life,* of the terms of the settlement and of the issues that it now raises in its belated objections to *Presidential Life.* Accordingly, the Settling Defendants were justified in their reliance on TLC's failure to opt out of *Presidential Life.* Such reliance was particularly justifiable in light of TLC's failure to object to the *Presidential Life* settlement prior to the effective date of the Milken Global Settlement, despite its knowledge of the Termination Provision. Finally, the Settling Defendants did so rely in determining to permit the settlement to become effective.[19] The class similarly relied on TLC's failure to act in a timely fashion by undertaking the allocation of the *Presidential Life* settlement fund.

63. Despite the fact that a consideration of the merits of TLC's remaining challenges to the Judgment is unnecessary because of TLC's failure to act earlier, the following conclusions address each of those challenges

in turn in the interests of conclusion and finality.

### Collusion

■ 64. *Presidential Life* is not void as a collusive suit. This Court found previously that the negotiations were conducted at arm's-length. Moreover, those negotiations were the subject of extensive supervision by the Court.

65. The fact that a suit is settled prior to class certification does not, in and of itself, demonstrate the existence of collusion. The law of this circuit, and of every other circuit to address the question, is that "settlement classes" are permissible.[20] TLC's use of the pejorative term "collusive" to describe the negotiation and settlement of the claims in this matter is a mischaracterization of what courts have deemed to be appropriate—the simultaneous filing and settlement of a class action.

### Subject Matter Jurisdiction

66. This Court properly exercised subject matter jurisdiction over *Presidential Life.* TLC has not even attempted to demonstrate that this Court "usurped" the power of a district court by exercising jurisdiction.[21]

v. *National Life Ins. Co.,* 486 F.Supp. 1018, 1023 (S.D.N.Y.1980); *General Elec. Capital Corp. v. Armadora,* 37 F.3d 41, 45 (2d Cir.1994). A party is estopped from acting in a certain way even if it did not intend that its prior, inconsistent conduct should be relied on, so long as the reliance on the prior conduct was reasonable. *See, e.g., United States v. Georgia–Pacific Co.,* 421 F.2d 92, 98 (9th Cir.1970).

18. *Adams v. Johns–Manville Corp.,* 876 F.2d 702, 706–07 (9th Cir.1989); *King v. Kansas City S. Indus., Inc.,* 519 F.2d 20, 27–28 (7th Cir.1975); *Cada v. Costa Line, Inc.,* 93 F.R.D. 95, 100 (N.D.Ill.1981).

19. *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988); *Cada,* 93 F.R.D. at 100; *see also Morrison–Knudsen Co. v. Rocky Mountain Chapter, Nat'l Elec. Contractors Ass'n,* 370 F.2d 463, 467 (10th Cir.1966).

20. The Second Circuit has repeatedly approved of the settlements of such actions. *See, e.g., Weinberger,* 698 F.2d at 73; *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292–93 (2d Cir.1992), *cert. dismissed,* 506 U.S. 1088, 113

S.Ct. 1070, 122 L.Ed.2d 497 (1993) (*"Drexel I"*); *see also In re Baldwin–United Corp. (MDL No. 581–CLB),* 105 F.R.D. 475, 482–83 (S.D.N.Y. 1984). The Third Circuit—the circuit most critical of the settlement class device—recently recognized the validity of such actions and stated: "[N]o court of appeals that has had the opportunity to comment on the propriety of settlement classes has held that they constitute a per se violation of Rule 23." *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 794 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) (citing cases); *see also id.* at 778, 786; *Flanagan v. Ahearn (In re Asbestos Litig.),* 90 F.3d 963, 975 (5th Cir.1996); *Manual for Complex Litigation* § 30.45, at 243–44 (3d ed. 1995); 2 Herbert B. Newberg and Alba Conte, *Newberg on Class Actions* § 11.27, at 11–43 to 44 (3d ed. 1992).

21. *Nemaizer,* 793 F.2d at 65; *see also Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 n. 9, 102 S.Ct. 2099, 2104 n. 9, 72 L.Ed.2d 492 (1982); *Cantor Fitzgerald, L.P. v. Peaslee,* 88 F.3d 152, 155 n. 2 (2d Cir.1996); *Picco v. Global Marine Drilling Co.,* 900 F.2d 846, 850 (5th Cir.1990); 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

Because TLC has not demonstrated that this Court lacks even an "arguable basis on which it could have rested a finding that it had jurisdiction," [22] and particularly because the class members, including TLC, had a full opportunity to raise previously the supposed lack of jurisdiction, the Court need not reach TLC's arguments regarding the existence of a case or controversy or the representative plaintiff's standing. Nonetheless, the Court will address TLC's assertions that *Presidential Life* did not constitute a case or controversy and that the representative plaintiff lacked standing to sue each defendant.

### Case or Controversy

67. *Presidential Life* constituted a case or controversy. To satisfy the requirements of Article III, there must be before the Court "a claim of substantive right." [23] The instant action involves a "claim of substantive right." The Complaint in *Presidential Life* alleged that the defendants had caused the representative plaintiff and the class members substantial injury through numerous violations of, *inter alia,* various provisions of the federal securities and antitrust laws. The Complaint also alleged that the defendants engaged in wrongdoing that involved a broad-based conspiracy and set forth three separate and distinct schemes which gave rise to the claims alleged therein. The substantial nature of these claims is demonstrated by the $50 million recovery. Only individuals who could allege Drexel-related claims against the Settling Defendants that they could have pursued if no settlement eventuated could satisfy the class definition. Moreover, the 180 plus actions settled in the Milken Global Settlement, as well as the allegations of the complaint in *FDIC v. Milken,* were premised on the same purportedly improper Drexel-related conduct that was the focus of the active controversy between the parties to *Presidential Life.*

68. The representative plaintiff and the *Presidential Life* defendants were true adversaries. The $23.7 million evaluation of the claims submitted by Presidential Life Insurance Company and a related entity provides further evidence of the substantial nature of the representative plaintiff's claims.

69. The *Presidential Life* settlement does not circumvent the bankruptcy laws. The relief afforded to the *Presidential Life* defendants is not equivalent to a discharge in bankruptcy both because class members could opt out of the settlement and because the defendants received releases only as to the Drexel-related claims against them. In contrast, a discharge in bankruptcy applies to virtually all claims, of whatever source or nature, against a debtor. Indeed, the *Presidential Life* settlement was part of the Milken Global Settlement which, in turn, was part and parcel of, and significantly facilitated, Drexel's plan of reorganization.

70. This Court found previously that the settlement negotiations were conducted at arm's length. Also, the *Presidential Life* settlement was subject to, and after careful scrutiny and deliberation received, Court approval.

### Standing

71. The representative plaintiff in *Presidential Life* had standing to assert the claims alleged in the Complaint. A class representative who alleges a conspiracy by a group of defendants has standing to sue each defendant, even if it did not enter into separate transactions with each defendant. [24] The *Presidential Life* Complaint alleges a tremendously complex conspiracy. It alleges concerted action, including conspiracy, in violation of the federal RICO statute and the antitrust laws, and alleges bases for "control person" and "aiding-and-abetting" liability. It alleges that each of the named defendants participated in the purported misconduct and

---

*Federal Practice and Procedure* § 2862, at 331 (2d ed. 1995).

**22.** *Nemaizer,* 793 F.2d at 65.

**23.** *In re Joint Eastern & Southern Dist. Asbestos Litig. (In re Keene Corporation),* 14 F.3d 726, 731 (2d Cir.1993).

**24.** *See, e.g., Rios v. Marshall,* 100 F.R.D. 395, 404 (S.D.N.Y.1983); *duPont Glore Forgan Inc. v. American Tel. & Tel. Co.,* 69 F.R.D. 481, 486 (S.D.N.Y.1975).

identifies the role that each class of defendants played in the alleged conspiracy.[25]

72. In the Second Circuit's opinion affirming this Court's approval of the Milken Global Settlement, Judge Cardamone described, in broad terms, the allegations that Michael Milken monopolized the entire "high yield junk bond market," in part through the use of "investment partnerships."[26] Judge Cardamone's reference to allegations of such a wide-ranging scheme in the very opinion in which the Second Circuit approved a settlement resolving claims against the same individuals and entities that constitute the Settling Defendants in *Presidential Life* is dispositive of TLC's standing argument.

73. Even if the Complaint's allegations were not clearly sufficient to allege a conspiracy, then TLC's argument would devolve into nothing more than a belated challenge to the adequacy—*i.e.*, the particularity—of the pleadings in *Presidential Life*. This argument, however, does not cast any doubt on whether the representative plaintiff had standing to pursue its claims. The Complaint clearly was not a baseless "attempt to establish a connection between the defendants in support of the motion for class certification."[27]

### *Adequacy of Representation*

74. The Court concludes that the representative plaintiff and class counsel in *Presidential Life* afforded the plaintiff class adequate representation. TLC fails to identify any harm flowing to the class as a result of what it claims was inadequate representation. As the Court found in its July 1992 Findings and Conclusions, class counsel made an extensive review of the facts underlying Drexel-related claims in connection with the *Presidential Life* settlement, Drexel's bankruptcy and the Milken Global Settle-

ment, among other proceedings. Moreover, class counsel represented plaintiffs with Drexel-related claims in the Drexel bankruptcy and *In re Ivan F. Boesky Securities Litigation*, MDL Dkt. No. 732, M21–45–MP (S.D.N.Y.), and had access to voluminous discovery and pleadings from related actions, including the Drexel bankruptcy. Thus, class counsel were informed adequately to assess the class members' claims.

75. TLC's purported concern that Class Counsel could not have adequately represented the plaintiff class in *Presidential Life* because of class counsel's role in related litigation is also without merit. Class counsel had strong incentives, in addition to their motivation to serve their clients' interests in good faith, to maximize the recovery in *Presidential Life*: (1) to minimize the number of opt outs, increasing the likelihood that the settlement would ultimately become effective; and (2) to ensure that the *Presidential Life* settlement fund was sufficient to survive the Court's scrutiny pursuant to Federal Rule of Civil Procedure 23(e).[28]

76. Particularly given class counsel's zealous representation of the *Presidential Life* class, and their role in the Drexel bankruptcy and other Milken related litigations, as well as the Court's close supervision of this settlement, TLC's argument that this action was settled with inadequate investigation of the class members' claims is without merit.

77. Class counsel and the members of the Executive Committee, including the SEC representative who is a member of that Committee, have undertaken extensive procedures in the allocation of the *Presidential Life* settlement fund among the eligible class members. Of the 4,778 claims filed in these proceedings, only two claimants filed objections to the Committee's proposed treatment

25. While certain of the entity defendants may not have existed at the same times, individuals who conspire separately with a third party may be held liable for conspiring together, *see, e.g., United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir.1988). Similarly, a conspirator who joins a conspiracy after its inception may be held liable for the prior bad acts of its co-conspirators. *See, e.g., United States v. Zabare*, 871 F.2d 282, 287 (2d Cir.), *cert. denied*, 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989).

26. *In re The Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1141 (2d Cir.1993) (*"Drexel II"*).

27. *Vulcan Soc'y v. Fire Dep't*, 82 F.R.D. 379, 389 (S.D.N.Y.1979).

28. *See Ahearn*, 90 F.3d at 980.

of their claims. The net result of the allocation process is that by Order dated July 8, 1996, this Court approved all of the Committee's claims evaluations, including those of the two objectors. The allocation process and the eligible class members' overwhelming support of that process further reflect the adequacy of class counsel's representation.

78. TLC has failed to identify antagonism between issuers, such as TLC, who alleged that Drexel had "stripped" equity from them in connection with issuances of bonds or other securities, and bondholders who claimed that they had obtained the right to receive such stock when they purchased the bonds at issue. The Second Circuit entered an opinion affirming this Court's order approving the Claims Agreement settling the securities claims in Drexel's bankruptcy proceedings, claims which also involved equity stripping claims brought by both issuers and security holders.[29] The Second Circuit determined that the class members' interests were not antagonistic and affirmed this Court's determination that the class received adequate representation.[30] Moreover, the *Presidential Life* claims have been resolved through the extensive allocation proceedings undertaken by class counsel and the Executive Committee, including the SEC representative, resulting in evaluations that have been approved by the Court.

79. Furthermore, adequate notice combined with class members' right to opt out from classes certified pursuant to Rule 23(b)(3) mitigates any concerns that this Court might otherwise have regarding conflicts among class members.[31]

### TLC's Intervention Motion

■■ 80. The Court finds that TLC's Intervention Motion is grossly untimely. The potential prejudice that may flow to the Settling Defendants and other class members if TLC is afforded relief from the Judgment, three years after its entry, makes intervention impermissible.[32]

81. TLC's Intervention Motion is also inadequate because, for the reasons stated above, TLC has failed to demonstrate that it has any valid interest which it could pursue if the Court permitted it to intervene. The Motion is futile because the counterclaims that TLC requests leave to bring in the New York Action appear on their face to be time-barred,[33] and because TLC in 1994 ratified the Agreement that is the subject of that Action and which TLC now desires to repudiate by its counterclaims.[34] Similarly, TLC has already been afforded all of the relief sought by its Intervention and Rule 60(b) Motions with respect to its Affirmative Defenses.

82. TLC pursued the right to bring its proposed counterclaims, as opposed to invoking affirmative defenses, only after Carlton initiated the contempt proceedings herein. TLC's inability to pursue its apparently tactically motivated counterclaims does not prejudice TLC, particularly given the denial of the contempt motion.

83. Finally, the Intervention Motion fails because TLC has not demonstrated that it has any interest which was not represented adequately by the representative plaintiff.[35]

84. TLC is thus precluded from attempting to upset the bargain which the parties

---

**29.** *Drexel I,* 960 F.2d at 291. As in its prior Findings and Conclusions in *Presidential Life,* the Court takes judicial notice of the proceedings in the Drexel bankruptcy and related proceedings.

**30.** *Id.*

**31.** *See In re Joint Eastern & Southern Dists. Asbestos Litig.,* 982 F.2d 721, 745 (2d Cir.1992), *modified,* 993 F.2d 7 (2d Cir.1993).

**32.** *United States v. Pitney Bowes, Inc.,* 25 F.3d 66 (2d Cir.1994); *see also Miller v. Silbermann,* 832 F.Supp. 663, 669 (S.D.N.Y.1993).

**33.** *See* N.Y.Civ.Prac.Law and Rules §§ 213(8), 203(g) (McKinney 1995) (statute of limitation for

fraud is the later of 2 years from discovery or 6 years from accrual); *Ghandour v. Shearson Lehman Brothers, Inc.,* 213 A.D.2d 304, 624 N.Y.S.2d 390, 392 (1st Dep't), *appeal denied,* 86 N.Y.2d 710, 635 N.Y.S.2d 947, 659 N.E.2d 770 (1995); *Hoffman v. Cannone,* 206 A.D.2d 740, 614 N.Y.S.2d 799, 800 (3d Dep't 1994); *Ply\*Gem of Laurel, Inc. v. Lee,* 456 N.Y.S.2d 382, 383 (1st Dep't 1982).

**34.** *See* Order of Justice Shainswit, in the New York Action, dated June 3, 1996.

**35.** *See supra* ¶¶ 74–79.

made as the result of intensely hard-fought negotiations, and thereby interfering with and delaying the satisfaction of the legitimate interests of other class members who actually did participate in a timely manner in these proceedings. TLC has not made a showing that circumstances exist that entitle it to expose the Settling Defendants to the risk that "other class members would come forward to request exclusion and the settlement would begin to unravel." [36]

### TLC's Request for Discovery

85. Taking into consideration the affidavits and other factual materials submitted by the parties, TLC has failed to raise any factual issues relevant to the instant motions that would require discovery. Moreover, TLC has failed to rebut the showing of the procedural adequacy of the *Presidential Life* notice program, or TLC's actual and constructive knowledge of the settlement therein, and thus has not demonstrated the need for discovery or an additional evidentiary hearing.

86. The foregoing shall constitute this Court's conclusions of law.

So ordered.

---

**36.** *VMS,* 1995 WL 355722, at *2; *O'Brien,* 739 F.Supp. at 902–03.